Carl Bruce HARRIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 42896.

Court of Criminal Appeals of Texas.

Sept. 23, 1970.

C. M. Gregg, G. P. Reddell, Texas City, for appellant.

Jules Damiani, Jr., Dist. Atty., Galveston, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Judge.

This appeal is from a conviction for murder where the jury assessed the death penalty.

The indictment charged the appellant with the murder of Elvie Susie Morwood "by cutting her with a knife." Some months prior to trial the State gave written notice that it would seek the death penalty. See Article 1.14, Vernon's Ann.C.C.P.

The State's evidence reflects that after some heavy drinking with a friend or friends the appellant returned to the home of the deceased, his foster mother, in Bacliff, Texas, in the early morning hours of January 15, 1967. At approximately 2:50 or 3 a. m. a fire marshal in Dickinson received a telephone call from a person who identified himself as Carl Bruce Harris, asked for help and stated that his mother was dead and that her throat had been cut. The fire marshal immediately relayed this message to the Galveston County Sheriff's office who dispatched units to the address that the caller had given. Ten minutes later the fire marshal received another call from the same individual giving the same address who urged him to "hurry" as his mother's girlfriend was now dead, that "she was killed." This message was also relayed to the Sheriff's office.

Upon arriving at the Bacliff address at 3:15 a. m. officers found the appellant and in a nearby bedroom the bodies of two women who were identified as Elvie Susie Morwood and Martha Beene. Both women had their throats slit and a great deal of blood was splattered on the walls and standing in pools on the floor. The Sheriff observed two bloody naked footprints which closely approximated the size of appellant's feet. Appellant was arrested and Justice of the Peace Medford, who had been called to the scene as a coroner, gave the "statutory warnings." Such warnings were clearly in accordance with Article 15.17, V.A.C.C.P., 1965, in effect at the time and the decision of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The magistrate even offered to call a lawyer at that hour (4:45 a. m.) and appoint him prior to any questioning and warned the appellant that his interrogation by the officers was about to commence. The appellant indicated that he understood the warnings and made no request of the magistrate.

Appellant was taken to the county building in Texas City where Sheriff Kline arrived around 6:15 a. m. During his preliminary investigation the Sheriff had discovered a used band aid under the body of one of the victims. While at the county building the Sheriff had the appellant remove his shoes, revealing what appeared to be dried blood caked between appellant's toes. The Sheriff also observed a laceration on the ring finger of appellant's right hand.

Appellant was then taken to the Department of Public Safety in Houston where a chemist removed a sample of dried blood from the appellant's feet. During the return trip to Galveston County the officers initiated a conversation with the appellant which as a result thereof the officers proceeded to the Bacliff address and retrieved from the kitchen a rack containing two knives, and the appellant pointed out to the officers the knife with which he stated he killed the two women.

At 10:25 a. m. Deputy Sheriff Adams who had accompanied the appellant on the trip to Houston gave him the warnings required by Article 38.22, V.A.C.C.P., then in effect, and after the appellant stated he did not want a lawyer a written confession

was taken, typed and prepared by 11:03 a. m. The appellant was not permitted to sign the same until a Justice of the Peace had been contacted, had gone to the jail and administered to the appellant warnings in accordance with Article 15.17, supra, and the Miranda decision. After reading the statement, the appellant signed the confession in the presence of witnesses and the · same was notarized.

The confession revealed that he killed both women by cutting them with a knife. It related that he returned home and discovered the two women engaged in an unnatural sex act, had knocked them unconscious, obtained a knife from the kitchen and killed both his foster mother and Martha Beene; that he washed the knife and returned it to the kitchen rack and then called the fire station in Dickinson.

■ Appellant complains he was denied an examining trial. The record reflects the appellant was brought before Judge Medford for an examining trial on January 17, 1967, and though without counsel at the time, personally waived such examining trial after his rights had been explained to him. The record does not reflect any request subsequent to that time for an examining trial. The return of the indictment on March 2, 1967, terminated any right to an examining trial. Article 16.01, V.A.C.C. P.; Gooden v. State, Tex.Cr.App., 425 S. W.2d 645; Ash v. State, Tex.Cr.App., 420 S.W.2d 703; Murphy v. State, Tex.Cr.App., 424 S.W.2d 231; Bryant v. State, Tex.Cr. App., 423 S.W.2d 320; Trussell v. State, Tex.Cr.App., 414 S.W.2d 466; Ward v. State, Tex.Cr.App., 427 S.W.2d 876; Wallace v. State, Tex.Cr.App., 429 S.W.2d 145; Scallion v. State, Tex.Cr.App., 433 S.W.2d 438; Klechka v. State, Tex.Cr.App., 429

S.W.2d 900, cert. den. 393 U.S. 1044, 89 S.Ct. 672, 21 L.Ed.2d 592; Wilhelm v. State, Tex.Cr.App., 426 S.W.2d 850; 21A Tex.Digest, Indictment and Information, Sec. 9, 10.1(1); Attorney General's Opinion C–718 (1966).

■ Though the preliminary hearing provided for in Article 16.01, V.A.C.C.P., may be a practical tool for discovery by the defendant, the primary justification for its existence is to protect the innocent defendant from incarceration on a totally baseless accusation.[1] Therefore, before the accused may be held for grand jury action, our statutes require the prosecution to justify his incarceration by proving in an examining trial before a magistrate that there is probable cause to believe the accused committed the offense charged. Article 16.17, V.A.C.C.P. See also Barrett v. United States, 270 F.2d 772, 775 (8th Cir., 1959). If the grand jury returns a true bill prior to the time that an examining trial is held, the principal purpose and justification of such hearing has been satisfied. See Vincent v. United States, 337 F.2d 891 (8th Cir.), cert. den. 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281. Action by a grand jury in returning the indictment supersedes the complaint procedure and eliminates the necessity of an examining trial. Jaben v. United States, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345; State v. Wigglesworth, 18 Ohio St.2d 171, 248 N.E.2d 607.

At the outset we shall also consider appellant's contention that his constitutional rights were violated by the trial court's exclusion of jurors who had conscientious or religious scruples against the infliction of the death penalty. Reliance is had upon Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

---

1. The traditional and statutory purposes of an examining trial are (1) to determine whether there is sufficient evidence of guilt to warrant further proceedings and if not to discharge the accused (Article 16.17, V.A.C.C.P.) and (2) to determine if bail should be allowed, and if so, to fix the amount of bail (Article 16.01, V.A.C.C.P.), and (3) to perpetuate the testimony of witnesses (Article 16.09, V.A.C.C.P.). As to the discovery aspects of such a hearing, see Articles 39.01 and 39.04, V.A.C.C.P.

There the Court said:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

The case at bar was tried prior to the date of the Witherspoon opinion and without the benefit of that decision. Nevertheless, such decision is to be applied retroactively. See footnote 22 thereof. See also Pittman v. State, Tex.Cr.App., 434 S.W.2d 352; Ex parte Bryan, Tex.Cr.App., 434 S.W.2d 123.

There was no effort, however, as in Witherspoon, to sweep from the jury panel all "conscientious objectors" in rapid succession without any effort to find out "whether their scruples would invariably compel them to vote against capital punishment." There was no systematic exclusion for improper cause. The jurors were examined separately and apart as required under Article 35.17, V.A.C.C.P., if requested. The appellant exercised seven of his 15 peremptory challenges and the State exercised 11 such challenges. Out of the 52 prospective jurors examined, appellant complains of the court's action in excusing seven, though others (7) were also excused because of their opposition to the death penalty.[2] One (H. L. Baker) of the seven called to our attention by the appellant was in fact excused because of his disagreement with the law as to the burden of proof in a criminal case and not because of his views as to the extreme penalty. The remaining six were excused without request for further interrogation by the appellant and without objection or exception to the court's action with the judge on occasion inquiring if appellant's counsel had further questions before he ruled. Mrs. R. E. Brunson stated she not only had "conscientious scruples" but "could not vote for the death penalty." O. W. Sadler stated he had "conscientious scruples" against the death penalty, had "studied that kind of situation quite a bit" and "could not figure out a way that" he "could go along." Upon being reasked the "conscientious scruples" question he answered, "I have to say yes to that." After the defense counsel stated, "no objections," he was excused. While being asked if she could render a verdict based on the law and evidence Mrs. Ella Curry volunteered that she was opposed to capital punishment and answered she had "conscientious objections" and could not vote for a death penalty. Joe McBride stated he had "conscientious scruples" and when asked if he could as a juror vote for death penalty said, "I don't believe in the death penalty—No, sir." Mr. Loraine Stevens, after some early difficulty in understanding the questions, told the court in answer to its inquiry that he could not vote for the death penalty. After interrogation by the defense counsel he stated, "No, I would not vote for the death penalty." He reaffirmed his position upon additional inquiry by the court and was then excused without objection. Mr. Kenneth Roberts, when asked the "conscientious scruples question" answered, "Yes, I do. I don't believe in capital punishment." Upon his being challenged for cause the court inquired, "Any questions?" and the defense counsel replied, "We have no questions." Roberts was then excused without objection.

■ While we recognize that the voir dire examination above described could have been more complete and definitive in the hindlight of Witherspoon, it is clear that five of the questioned six indicated they could not vote for or impose the ultimate penalty. Their discharge was proper under Witherspoon as was the discharge of

2. There is no question but that the excusing of these seven jurors was clearly within the Witherspoon standards and it is understandable why appellant did not object to their being excused and does not now complain of the same.

the seven other jurors about whom the appellant raises no question. This leaves only the excusing of the prospective juror Roberts to whose discharge there was no objection. We are convinced that when the voir dire examination is considered as a whole,[3] the State did not "stack the deck" or cross the "line of neutrality" with respect to penalty in the selection of the jury or that the jury was a "tribunal organized to return a verdict of death." The spirit of Witherspoon was not violated.

The jury was selected in a manner consistent with the Texas rule discussed in Pittman v. State, Tex.Cr.App., 434 S.W.2d 352 and Scott v. State, Tex.Cr.App., 434 S.W.2d 678, which was held not to contravene the Witherspoon doctrine. See also Branch v. State, Tex.Cr.App., 447 S.W.2d 932; Whan v. State, Tex.Cr.App., 438 S.W.2d 918.

Further, in Scott v. State, supra, this Court said:

"The fact that one or more veniremen may have been excused on challenge for cause without a full showing that they would not in any case vote for the death penalty does not mean that the jury was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or that the state 'stacked the deck' against appellant.

"It means simply that counsel for the defense did not see fit to examine them further, either because he did not want the particular juror or because he was satisfied that they understood that, having scruples against the death penalty, they would not consider voting for the death penalty in any case." See also Huffman v. State, Tex.Cr.App., 450 S.W.2d 858; McKenzie v. State, Tex.Cr.App., 450 S.W.2d 341; Thames v. State, Tex.Cr.App., 453 S.W.2d 495.

In State v. Adams, 76 Wash.Dec.2d 819, 458 P.2d 558, where there was no systematic exclusion of veniremen for improper cause, the Washington Supreme Court also refused to reverse a death penalty conviction merely because one venireman was improperly excluded under Witherspoon standards.[4] See also Bell v. Patterson, 402

---

3. It would certainly seem that the "atmosphere of the proceedings" must be examined in resolving the question of whether the jurors were properly selected within the Witherspoon rationale. Jaggers v. Commonwealth, 439 S.W.2d 580 (Ky.); Illinois v. Speck, 41 Ill.2d 177, 242 N.E.2d 208.

In People v. Bernette, 45 Ill.2d 227, 258 N.E.2d 793, the Illinois Supreme Court held that where the prosecution had 33 of their 40 peremptory challenges remaining at the completion of jury selection and a sincere effort had been made to select fair and impartial jurors, exclusion from jury of individuals who stated they had conscientious scruples against capital punishment did not deny defendants a fair trial in murder prosecutions. Twelve jurors or 21% of all jurors excused were improperly excused under Witherspoon standards but the court determined the error was not reversible, noting the sincere desire of the prosecutor and the court to determine the jurors' qualifications according to Witherspoon. The court cited People v. Speck, supra, and People v. Moore, 42 Ill.2d 73, 246

N.E.2d 299 in support of its holding. Justice Schaefer dissented. (The same court later reversed a conviction where the record revealed a conscious design on part of the State to empanel a jury which would not only impose the death penalty but would do so without hesitation. People v. Mallett, 259 N.E.2d 241 (Ill.). Here 27 jurors or 36% of all prospective jurors excused "were probably erroneously dismissed under standards later enunciated in Witherspoon" with only 11 prospective jurors being properly discharged thereunder.)

4. We are aware of those decisions which would seem to hold that even if one prospective juror was improperly excluded under the Witherspoon doctrine, an otherwise errorless death penalty conviction would fall. See In Re Anderson, 69 Cal.2d 613, 73 Cal.Rptr. 21, 447 P.2d 117; People v. Terry, 70 A.C. 427, 77 Cal.Rptr. 460, 454 P.2d 36; Smith v. State, 224 Ga. 750, 164 S.E.2d 784; Crook v. Henderson, 310 F. Supp. 200 (E.D.La.). Some of these cases would seem to hold that the failure to object does not bar a defendant from

F.2d 394, 399 (10th Cir.); State v. Mathis, 52 N.J. 238, 245 A.2d 20, 27; 53 Minn.L. Rev. 838, 844.

The Ohio Supreme Court in State v. Wigglesworth, 18 Ohio St.2d 171, 248 N.E. 2d 607, held that where a defendant failed to object to the excusing of a prospective juror merely because of her opposition to capital punishment, the defendant, having a statutory right to oppose such exclusion— a right similar to that articulated as a constitutional right in Witherspoon—not only waived any right to object to the excusing but could be said to have induced the error first complained of on appeal. See also State v. Duling, 254 N.E.2d 670 (Ohio).

The same court held that the failure to object at the voir dire to the exclusion of a juror relating to his opinion as to the death penalty constitutes a waiver and precludes raising the issue on appeal *although a pre-Witherspoon trial.* State v. Laskey, 21 Ohio St.2d 187, 257 N.E.2d 65. Cf., however, Bean v. State, 465 P.2d 133. (Nev.)

In Pittman v. State, supra, in discussing the state practice prior to Witherspoon, this Court said:

"The challenge for cause on this ground has always been understood to mean that because of such scruples the juror could never vote to inflict the death penalty in any case regardless of the facts or circumstances. Until this appeared the challenge for cause was not sustainable." See Article 35.16, Sec. (b) (1), V.A.C. C.P.

In Paramore v. State, 229 So.2d 855, the Florida Supreme Court decided a defendant cannot complain that prospective jurors were excused by the court merely because they held conscientious scruples against inflicting the death penalty in violation of Witherspoon where he made *no objection* to their removal and no attempt to qualify them for service.

There the Court said:

"It was not the duty of the trial court to take other steps toward attempting to qualify the veniremen, and the Witherspoon case, supra, should not be construed as imposing this additional duty upon the trial court in the absence of any expression of a desire by defense counsel to keep the prospective jurors. Pittman v. State, 434 S.W.2d 352 (Tex.Cr.App.1968). See also State v. Forcella, 52 N.J. 263, 245 A.2d 181 (1968). The appellant is in no position to complain in the instant case

---

later claiming a Witherspoon error in excusing a prospective juror, particularly in a pre-Witherspoon case. Bean v. State, Nev., 465 P.2d 133; In Re Hill, 71 A.C. 1039, 80 Cal.Rptr. 537, 458 P. 2d 449. And that a defect cannot be cured by looking to the entire examination of other jurors because the correct examination must center on each prospective juror. Bean v. State, supra. Further, it would appear that some courts would impose a duty upon the trial court to make it clear to a prospective juror that opposition to the death penalty or conscientious scruples against that penalty would be insufficient to disqualify him from service. Bean v. State, supra. Such decisions seem highly unrealistic where in some cases hundreds of prospective jurors must be examined over a period of a week or more before the jury is finally chosen. To reverse because one prospective juror voiced general objec-

tions to the death penalty and is excused without objection or indication that the defense desires further interrogation would reach an absurd result. We find nothing in Witherspoon which would dictate that the ultimate goal of that decision was nothing less than a letter perfect voir dire examination.

After remand from the United States Supreme Court, the Washington Supreme Court in State v. Aiken, 75 Wash.2d 421, 452 P.2d 232, found that the jury selection in such case did not violate the spirit of Witherspoon. There the Washington Court said:

"We are satisfied Witherspoon does not demand nor compel a formulistic dialogue on voir dire examination in order to establish that a prospective juror maintains views which preclude him from imposing capital punishment under any circumstances."

because no objection was interposed, nor did defense counsel attempt to clarify the juror's attitude as it related to his or her ability to decide the issues impartially."

We are not unmindful of what was said in footnote #9 of the Witherspoon opinion[5] which was discussed in Ex parte Bryan, Tex.Cr.App., 434 S.W.2d 123, 125, or the examples of voir dire interrogation given in Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 and Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221, which apparently do not meet the Witherspoon standards, but in the latter two cases there was a remand to the district court without the court finally deciding the question. In neither case was the question of waiver mentioned nor was there a discussion of the judge's obligation when the State has challenged for cause

and the defense indicates it has no questions.

While in Pittman we concluded that the normal Texas practice would satisfy the Witherspoon decision, we acknowledged that its requirements would cause a sharpening of the practice.

■ In light of footnote #9 of the Witherspoon opinion and the Boulden v. Holman and Maxwell v. Bishop decisions, it would be well for the bench and bar to keep in mind what every experienced criminal trial lawyer knows—that laymen have little understanding of the phrase "conscientious scruples" and it is not an easy phrase for judges and lawyers to explain to prospective jurors. Before prematurely challenging for cause a prospective juror who has only affirmatively answered the so-called statutory question,[6] prosecutors

---

5. In said footnote #9 of the Witherspoon opinion the Court said in part:

"[I]t cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' (see People v. Bandhauer, 66 Cal.2d 524, 531, 58 Cal.Rptr. 332, 337, 426 P.2d 900, 905) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him. * * *

"The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors. Any 'layman * * * [might] say he has scruples if he is somewhat unhappy about death sentences. * * * [Thus] a general question as to the presence of * * * reservations [or scruples] is far from the inquiry which separates those who would never vote for the ultimate penalty from those who would reserve it for the direst cases' Id., at 308–309. Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."

6. "Do you have conscientious scruples against the infliction of death as a pun-

ishment for crime in proper case?" See Article 35.16(b) (1), V.A.C.C.P.

Many times a prospective juror will ask the meaning of "conscientious scruples" and judges and lawyers are often ill-prepared to explain.

Ballentine's Law Dictionary, 3rd ed., defines "conscience" as "a person's nattural judgment of right and wrong and 'principle': the result of judgment is tested by reason, defended by argument, and yields to the decision of an intelligent mind. 'Conscience' springs from some internal source of self knowledge, which acknowledges no superior, bows to no authority, yields to no demonstration, and is governed by no law; it ignores reason, defies argument, and is unaccountable and irresponsible to all human tests and standards; it is a law unto itself, and its scruples and its teachings are not amenable to human tribunals, but rest alone with its possessor and his God. People v. Stewart, 7 Cal. 140."

The phrase "conscientious scruple" is not defined in the statute (Art. 35.16, Sec. (b) (1), V.A.C.C.P.), and must be given its ordinary meaning. The term "conscientious scruple" is defined in Words and Phrases, Vol. 8A, p. 181, as "an objection or repugnance growing out of the fact that a person believes the thing demanded of him to be morally wrong, his conscience being the sole guide to his decision, thus distinguished from an 'objection on principle,' which is dictated by the reason and judgment, rather

should go beyond such initial expression of "conscientious scruples" or disclaimer of belief in capital punishment to clearly ascertain and establish that the prospective juror would automatically vote against the death penalty in any case regardless of the facts, could never vote for or consider its imposition in any case irrespective of the evidence, could not abide by the existing law and would not follow the trial court's instructions, could not assess such penalty in the particular type of case at bar, etc.

If the defense counsel with or without interrogation indicates there are no further questions, it may be well for the court to inquire if such action means the defense is not opposing the challenge for cause, or if the defendant personally and his counsel are affirmatively waiving his constitutional rights which may have accrued under the Witherspoon decision, and make sure such colloquy is made part of the record.

■ And it should be noted that Witherspoon made it clear that it did not preclude challenges for cause by the prosecution of those prospective jurors whose reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Therefore, if a prospective juror holds reservations about the death penalty, however strong or weak, which would prevent him from being an impartial juror on the issue of guilt, he may be properly challenged for cause. See also Article 35.16(b) (3), V.A.C.C.P.

Finding no violation of Witherspoon in the case at bar, we move on.

The appellant next contends the court erred in permitting the jury to consider the inflammatory testimony of Dr. Alphonso J. Strano, since it was based on hearsay and given "without adequate identification of the body or pictures thereof" with the autopsy report being materially altered.

Dr. Strano performed the autopsy on both victims on January 15, 1967. He testified that both had been severely beaten, throats slashed, and jugular veins severed; that the knife introduced could have caused the wounds found.

■ During cross-examination appellant's counsel asked to see the notes that Dr. Strano had used during direct examination. It was then discovered that there had been ink alterations on some of the typed portions of the autopsy reports. Out of the jury's presence Dr. Strano explained that at the time of the autopsies he had been misinformed as to the identity of the two women and had carried the error forward in the written reports. Prior to his testimony the matter was called to his attention and upon determining that he had identified Mrs. Morwood as Mrs. Beene and vice versa, he personally altered the autopsy reports in ink. He identified State's Exhibit #7 as a color photograph of Mrs. Morwood taken at the time of the autopsy and State's Exhibit #9 as one of Mrs. Beene and related that these were the two women upon whom he had performed autopsies on January 15, 1967. Myrtle Dudley identified State's Exhibit #7 as a photograph of her sister, Elvie Morwood and State's Exhibit #9 as Martha Beene with whom she was well acquainted. Dr. Strano repeated his testimony in the jury's presence as did Mrs. Dudley. In view of the circumstances of this case, the undisputed evidence from another source other than the doctor as to the identity of the two victims and the appellant's confession, we cannot perceive reversible error in the admission of his testimony as to identification or the failure to strike such testimony. See Langston v. State, Tex.Cr.App., 416 S.W.2d 821. The careful trial judge did

than the moral sense, and may relate only to the propriety or expediency of the thing in question. People v. Stewart, 7 Cal. 140, 141, 144." See also 15A C.J.S. p. 571; Black's Law Dictionary, De Luxe Fourth Edition.

not permit the colored photographs to be introduced or seen by the jury.

■ Appellant further complains of the admission into evidence, over objection, of three black and white photographs which depict the bodies of the deceaseds as they were found by the investigating officers. While blood spots on the bed and blood on the floor may be detected in the pictures, they do not reflect the lacerations and deep neck wounds sustained by the deceased and her companion. These photographs, which the witnesses related correctly depicted the scene of the crime and which showed the position of the clothing on the bodies, were not introduced into evidence until after an issue as to the identification of the women had been raised and after cross-examination of the witnesses as to the position of the bodies when found and the type of clothing worn.

In 29 Tex.Jur.2d, Homicide, Sec. 161, p. 222, it is written:

"The gruesomeness of an article offered in evidence should not prohibit its introduction if it will aid the jury in arriving at the truth of the matter. However, a photograph is not admissible if it does not illustrate or make clear any question in the case. This is particularly true of a photograph that is calculated to prejudice or inflame the minds of the jury, or that would tend to create confusion."

The "disputed issue" rule which permits the introduction of photographs gruesome in nature if they tend to shed light upon a disputed fact issue was discussed in Pait v. State, Tex.Cr.App., 433 S.W.2d 702, and in Hart v. State, Tex.Cr.App., 447 S.W.2d 944, this Court upheld the introduction of photographs of the prosecutrix in an assault with intent to rape taken at a hospital the morning after the alleged offense.

Under the circumstances and after an examination of the photographs, we conclude the court did not err in their admis-

sion. Pait v. State, supra. See also 73 ALR2d 769, 825.

Further, in Burns v. Beto, 371 F.2d 598 (5th Cir.), the Court pointed out that the admission of photographs must necessarily rest largely in the discretion of the trial judge. There the Court said:

"We hold that, so long as photographs accurately represent what they purport to depict and are logically relevant, their extreme gruesome and prejudicial character cannot make their admission in evidence amount to a denial of due process."

Appellant also urges that the court erred in failing to respond to his special requested charge and instruct the jury not to consider in their deliberations on the issue of guilt or innocence any penalty, confinement or punishment that might eventually be assessed.

Under the former Code of Criminal Procedure, when the unitary trial prevailed, the court was required to submit to the jury in its charge the punishment applicable to the offenses submitted. Under the 1965 Code (which became effective January 1, 1966) Article 37.07, V.A.C.C.P., provided for bifurcated trials and prescribed that at the first stage of the trial the jury would pass upon the issue of guilt without being authorized at that time to pass upon the punishment to be imposed. However, Section 2(a) of such statute required the court to include in its charge submitting the issue of guilt or innocence "instructions showing the jury the punishment by law for each offense submitted." Such statute as enacted in 1965 did not encompass capital cases where the State was seeking the death penalty, such as the case at bar. Rojas v. State, Tex.Cr.App., 404 S.W.2d 30; Williams v. State, Tex.Cr.App., 415 S.W.2d 917; Jones v. State, Tex.Cr.App., 416 S.W.2d 412; Wilhelm v. State, Tex. Cr.App., 426 S.W.2d 850; Pittman v. State, Tex.Cr.App., 434 S.W.2d 352. It was expressly amended in 1967 (Acts 1967, 60th Leg., p. 1739, ch. 659, Sec. 22) to include such cases, and the requirement that the

court instruct the jury at the first stage of the bifurcated trial as to the applicable punishment was eliminated. Although the jurors were still not authorized to pass upon punishment at this stage, there was no statutory requirement that they be instructed as to the penalty in the charge, even though in most cases they would be informed of the same during the voir dire examination of the jury panel.

Appellant's trial commenced (September 11, 1967) after the effective date of the said 1967 amendment (August 28, 1967). The court's charge at the guilt stage of the trial did not in any way authorize or infer that the jury should assess punishment at this stage of the proceedings.

The special written requested charge found in the record does not reflect on its face that it was filed and presented to the court prior to the charge at the guilt stage of the trial. See Article 36.15, V.A.C.C.P. Assuming that it was properly and timely presented, the giving of admonitory instructions lies within the sound discretion of the trial court. 31 Tex.Jur.2d, Instructions, Sec. 83, p. 623.

The appellant contends the court's error was compounded by the fact that the jury during their deliberations sent the following question to the court: "Is there any sentence this jury can give to insure that this defendant cannot be paroled?" This question, however, was not submitted until the jury had retired to deliberate on the issue of punishment at the second or penalty stage of the trial under another charge or set of instructions. The court properly answered that the jurors were not to discuss among themselves "how long the defendant would be required to serve any sentence, if any, you impose" and, further, that the matter of parole was exclusively within the jurisdiction of the Board of Pardons and Paroles and the Governor. There was no objection to the court's answer to the jury's inquiry.

In Taylor v. State, Tex.Cr.App., 420 S. W.2d 601, 608, this Court said:

"It is a matter of common knowledge that from time to time inmates of the Texas Department of Corrections are released on parole, Torres v. State, 169 Tex.Cr.R. 113, 331 S.W.2d 929; Walker v. State, Tex.Cr.App. [150 Tex.Cr.R. 421], 201 S.W.2d 823, and it is not every mention of parole which calls for a reversal. Henderson v. State, 169 Tex. Cr.R. 206, 332 S.W.2d 705; De La Rosa v. State, 167 Tex.Cr.R. 28, 317 S.W.2d 544. There is no showing that any further discussion followed receipt of the judge's answer, or that at any time during deliberations any juror made an incorrect statement of the law concerning parole which would justify reversal." See also Edwards v. State, 427 S.W.2d 629.

The motion for new trial was not supported by the affidavit of a juror or other person in a position to know the facts and nothing is presented for review with regard to jury misconduct. Graves v. State, 169 Tex.Cr.R. 595, 336 S.W.2d 156, cert. den. 363 U.S. 819, 80 S.Ct. 1256, 4 L.Ed.2d 1516; Procella v. State, Tex.Cr.App., 395 S.W.2d 637; 1 Branch's Ann.P.C., 2nd ed., Sec. 595, p. 567. And further, at the hearing on the motion for new trial no effort was made to offer such evidence despite the defective pleading.

We see no error presented by appellant's contention.

In a related ground of error appellant urges the court erred in its charge at the guilt stage of the proceedings in instructing the jury as to the punishment for "murder without malice" contending the same was in conflict with the provisions of Article 37.07, supra. The portion of the charge complained of is as follows:

"Murder, as above defined, may be committed either with or without malice aforethought. When murder is committed, but not with malice aforethought, the

punishment for such murder is by confinement in the penitentiary for any term of not less than two nor more than five years."

Murder with and without malice aforethought was thereafter defined. When appellant's *oral* objection to the charge on this basis was made, the trial judge called attention to the provisions of Article 1257b, Vernon's Ann.P.C., requiring him to so instruct the jury, and he offered to instruct the jury on the penalty of both murder with and without malice. Such offer was refused.

The trial court noted the provisions of Article 36.14, V.A.C.C.P., but invited the attorneys to dictate their objections to the charge to the court reporter. This was done, and oral objections were not reduced to writing and filed until some six months later. This was clearly not in accordance with the law. See Smith v. State, Tex.Cr. App., 415 S.W.2d 206; Seefurth v. State, Tex.Cr.App., 422 S.W.2d 931; Sockwell v. State, Tex.Cr.App., 429 S.W.2d 460; Smith v. State, Tex.Cr.App., 430 S.W.2d 496; Walker v. State, Tex.Cr.App., 440 S.W.2d 653; Baity v. State, Tex.Cr.App., 455 S.W. 2d 305 and cases there cited. Even if the objections had been properly and timely made, we would perceive no error. See Watts v. State, Tex.Cr.App., 430 S.W.2d 200; Webb v. State, Tex.Cr.App., 439 S.W. 2d 342; Houston v. State, Tex.Cr.App., 428 S.W.2d 353. Cf. Sumrell v. State, Tex.Cr.App., 436 S.W.2d 544.

■ Next, appellant contends the court erred in instructing the jury (as to the voluntariness of the confession) that it must find that he "appeared" before a magistrate rather than was "taken." The requested charge was obviously based on the requirements of Articles 15.17 and 38.22. V.A.C. C.P., 1965, in effect at the time of said statement, and appellant relies upon the word "take" as used in said Article 15.17. A person "taken" before a magistrate certainly "appears" before such magistrate. We find no merit in such contention.

■ Appellant also advances the claim that the court erred in failing to respond to his special requested instruction that unless the jury found beyond a reasonable doubt that he was given a reasonable time and opportunity to consult an attorney or engage the services of an attorney before making a confession the jury should acquit him. Here again appellant relies upon the wording of Article 15.17, V.A.C.C.P. What appellant overlooks is the fact that the requested instruction does not present a correct statement of the law and the court did not err in overruling the same. The asked for instruction does not request that the jury be told, in event of such finding, to disregard the confession and not consider it for any purpose in their deliberations, but would instruct them to find him "not guilty."

In view of the charge given, the undisputed testimony of Justice of the Peace Medford that he offered the appellant an opportunity to call an attorney of his own choice, or that he would call and appoint an attorney, even at that hour (4:45 a. m.), and the evidence of the subsequent waiver of counsel, clearly no error is presented.

■ If we understand it correctly, appellant takes the position that prior to the confession being read to the jury, the court erred in failing to require the jury to specially find that the same was freely and voluntarily given and admissible in evidence.

The court conducted a separate hearing out of the jury's presence on the voluntariness and admissibility of the written confession in accordance with Article 38.22, V.A.C.C.P. Thereafter he filed his written findings of fact and conclusions of law. Such procedure complies with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L. Ed.2d 908; Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593; Lopez v. State, Tex.Cr.App., 384 S.W.2d 345; Black v. State, Tex.Cr.App., 432 S.W.2d 951; Treadway v. State, Tex.Cr.App., 437 S.W. 2d 572. When the issue of voluntariness

was raised by the evidence before the jury the court submitted such issue to the jury in its charge at the conclusion of the evidence at the guilt stage of the trial.

We are not aware of any authority and the appellant cites none which would require the procedure appellant urges. Such procedure, where the issue of the voluntariness of confession is raised by the evidence before a jury, would in effect require a trifurcated trial with another charge, arguments, special verdict or finding by the jury, etc.

In Jackson v. Denno, supra, the United States Supreme Court approved both the orthodox rule and the so-called Massachusetts rule for determination of the voluntariness of a confession.

Under the so-called orthodox rule, if the judge finds the confession involuntary the matter ends. Contrariwise, if the judge determines it to have been voluntarily made, it is admitted but the issue of voluntariness is not submitted to the jury. Jury consideration is limited to its weight and credibility.

Under the Massachusetts rule, if the trial judge finds the confession involuntary, it is not admitted. If he, however, determines it to have been voluntarily given and admits it, his conclusions are expressly stated or readily ascertainable from the record. The jury may still disregard the confession and by its own deliberation, under instruction, find it to have been involuntarily given.

After Jackson this Court in Lopez v. State, supra, adopted a version of the so-called Massachusetts rule for this state. See now Article 38.22, V.A.C.C.P.

Neither the Massachusetts or the orthodox rule requires a special issue submission or special verdict. See also United States v. Anderson, 394 F.2d 743 (2nd Cir.) ; Marion v. Beto, 302 F.Supp. 913 (N.D.Tex.).

The difficulty with such approach was explored in 78 Harvard Law Review, No. 1, p. 211, 213.

The appellant further contends the confession was inadmissible since the warnings given by Judge Medford were not for the crime for which he was indicted. This claim is based on the fact that Judge Medford informed the appellant at the scene of the alleged crime that he was being arrested on "suspicion of murder." No affidavit or complaint had then been filed but was shortly thereafter. Article 15.17, V.A.C. C.P., contemplates that there will be occasions where no formal charges have been filed when the accused is taken before the magistrate. No error is here presented.

Appellant next raises the point that his confession was typed and prepared for signing before he was given any warnings by Justice of the Peace McKenna at 1:29 p. m. on January 15, 1967. At the time that appellant's confession was taken, Article 38.22, V.A.C.C.P., 1965, required a dual warning by a magistrate and the person taking the statement. The appellant was warned at 4:45 a. m. by Judge Medford and at 10:25 a. m. by the officer taking the confession. Thus the requirements of the said Article 38.22 were met. The cautious officers, however, called another magistrate before the confession was actually signed and had him again warn the appellant. Such warning was not essential to the admissibility of the statement. Further, this Court in De Beauford v. State, 95 Tex.Cr.R. 398, 254 S.W. 572, in speaking of written confessions, said, "The statement alleged to be the confession of appellant does not become his until his signature is affixed thereto."

Relying upon Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423, appellant contends his constitutional rights were violated in that when the record is considered in its entirety, it is clear that such alleged confession was not voluntarily given.

In our opinion this case is not Clewis nor governed by that decision. The facts are markedly different. The warnings, etc., and the compliance with the Miranda decision, have already been noted. While there was an earlier oral confes-

sion leading to the weapon with which appellant stated he committed the alleged offense, it was shown to have been admissible, Lee v. State, Tex.Cr.App., 428 S.W. 2d 328, and it was not repudiated by the appellant. There is no showing of abuse, coercion, compulsion, or persuasion. He was in custody from 4:45 a. m. until 1:29 p. m. when he signed the written confession and had been taken to Houston, but there is nothing to indicate he was deprived of food or water, etc. One of the officers related that he offered the appellant coffee and a fried pie for breakfast at Houston as that was what he had but the appellant declined. He was shown to have been fed at the county jail prior to signing the confession. The record does not support any claim that appellant's faculties were impaired by inadequate sleep. Further, this was not the appellant's first brush with the law. He had been previously convicted of burglary, felony theft and aggravated assault. And his estranged wife whom he had called was present with him at the scene of the alleged crime when he was given his first warnings by Judge Medford.

Considering the "totality of the circumstances," we cannot conclude that the appellant was deprived of due process thus rendering his written confession involuntary.

Finding no reversible error, the judgment is affirmed.