**Albert Ray (Scott) WOOLDRIDGE, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 67876.

Court of Criminal Appeals of Texas, En Banc.

July 20, 1983.

Larry D. Robertson, Abilene, for appellant.

Patricia A. Elliott, Dist. Atty., Gerald Brantley and Jorge A. Solis, Asst. Dist. Attys., Abilene, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for the offense of capital murder committed in the course of aggravated rape. V.T.C.A. Penal Code, § 19.03(a)(2). Pursuant to V.T.C.A. Penal Code, § 8.07(d) and Article 37.-071(e), V.A.C.C.P., appellant's punishment was assessed at life confinement.

In his first ground of error, appellant contends the district court did not have jurisdiction over the person tried and convicted in this cause. Specifically appellant claims that after the juvenile court waived its jurisdiction and transferred the cause to district court, he did not effectively waive his right to an examining trial because the record does not reflect he was informed of and understood the right to an examining trial and the consequences of a waiver; further, appellant contends his waiver, signed in open court, was involuntary where the only charge pending against him at that time was murder, and not capital murder.

Once a juvenile defendant[1] has been certified to stand trial as an adult, he is entitled to an examining trial, V.T.C.A. Family Code, § 54.02, and absent an exam-

---

1. Appellant was sixteen years old at the time of the commission of the offense and seventeen years of age at the time of arrest and trial.

ining trial or valid waiver thereof, the district court is without jurisdiction to try him. *Menefee v. State,* 561 S.W.2d 822 (Tex.Cr. App.1972). This right can, however, be waived if done in compliance with V.T.C.A. Family Code, § 51.09.[2] *Criss v. State,* 563 S.W.2d 942 (Tex.Cr.App.1978).

The record reflects a written waiver which complies with the requisites of § 51.-09, supra. Further, a transcription of the court reporter's notes reflects that on April 11, 1980, this waiver was read into the record by appellant's attorney, who had already signed it. Included in the waiver was the statement that "[t]he attorney for the child has explained this right [to an examining] trial to the child and is satisfied that the child understands the right to an examining trial and the possible consequences of waiving the right."

After this oral recitation by counsel, appellant signed the waiver in open court.

The transcription also contains the following explanation by the trial judge:

"THE COURT: Now, Mr. Wooldridge, I want to be sure you understand this, Son. You have a right to an examining trial. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And Mr. Robertson [defense counsel] explained that to you. *And that is where the Court would hear evidence and determine whether or not I feel there is sufficient evidence to warrant a Grand Jury to further consider your case;*[3] and you have told me here in writing, or your lawyer has, that you don't want an examining trial—that I understand you have heard this evidence before Judge McMillon, you and your lawyer were there present when they had the certification hearing—you are saying that you understand you have a right to have an examining trial, but you don't want one; and you understand that, and that is what you wish to do.

THE DEFENDANT: Yes, it is."

Finally, the record reflects that at the time of the waiver proceeding, the prosecutor had tendered to defense counsel all sworn witnesses' statements, as well as the two written statements made by appellant.

The thrust of appellant's contention is that his waiver was rendered involuntary because he stood charged by complaint only for murder when he made it, whereas the grand jury subsequently indicted him for *capital* murder.[4]

We believe appellant's reasoning regarding the significance of the murder complaint and its relationship to the voluntariness of his waiver misapprehends the import of a complaint in the criminal process, the purpose of an examining trial, as well as the power and functions of the grand jury.

The purpose of an examining trial is to determine from evidence adduced whether there is probable cause to believe an accused has committed an offense,[5] accordingly to release or retain the accused in custody and, if appropriate, bind the cause

---

**2.** Section 51.09, supra, provides in relevant part:

"(a) Unless a contrary intent clearly appears elsewhere in this title or by the constitution or laws of this state or the United States may be waived in proceedings under this title if:

(1) the waiver is made by the child and the attorney for the child;

(2) the child and the attorney waiving the right are informed of and understand the possible consequences of waiving it;

(3) the waiver is voluntary; and

(4) the waiver is made in writing or in court proceedings that are recorded."

**3.** All emphasis is added throughout by the writer of this opinion unless otherwise indicated.

**4.** Appellant's contention does not implicate the Court's recent disposition in *Ex parte Allen,* 618 S.W.2d 357 (Tex.Cr.App.1981) in which we determined a certified juvenile could not be indicted for "offenses arising from *conduct not considered* by the juvenile court in the certification hearing."

**5.** Article 16.01, V.A.C.C.P. provides that the magistrate is to "examine into the truth of *the accusation made,*" because the accusation extant is responsible for the deprivation of liberty at issue. See *Garcia v. State,* 547 S.W.2d 271 (Tex.Cr.App.1977).

over for presentation to a grand jury. *Ex parte Guzman,* 589 S.W.2d 461 (Tex.Cr.App. 1979). In turn, the grand jury is empowered with authority to call any witness and "inquire into all offenses liable to indictment." Articles 20.09, 20.10 and 20.11, V.A. C.C.P. Compare *Tatum v. State,* 534 S.W.2d 678 (Tex.Cr.App.1976). "Offenses liable to indictment" has never been construed to be limited by considerations made at the examining trial. In contrast, the function of a "complaint" is essentially and primarily to authorize the arrest of one shown to have "committed some offense against the laws of the State." Article 15.05, V.A.C.C.P.; see generally Chapter 15.[6]

We are not persuaded that the bare fact appellant was charged with murder by complaint alone necessarily *establishes* his unawareness of the possibility he might be indicted for capital murder by a grand jury. Moreover, it is inconceivable as a factual matter that defense counsel, possessed of his client's written inculpatory statements and sworn statements of other witnesses relating the facts of the offense committed, would be unaware that they established, among other offenses, a capital murder. And there is no indication from any source that the State had entered into an agreement with appellant that he would ultimately be prosecuted for only murder.

▇▇▇ Under these circumstances, appellant's oral and written representations to the trial court of his and his attorney's understanding of the right and possible consequences of its waiver are binding;[7] such

---

6. Of course, this is likewise one of the functions of an indictment in a felony case, and for that reason, the return of an indictment supercedes complaint procedures; *Harris v. State,* 457 S.W.2d 903 (Tex.Cr.App.1970); but an indictment actually authorizes a felony prosecution in a district court, whereas a complaint does not.

7. The responsibility of having a "firm command of the facts of the case as well as governing law" in order to assist and advise one criminally accused is not one placed on the State by the Family Code, § 51.09, supra. See

---

representations cannot be overcome by mere assertions on appeal.[8]

This first ground of error is overruled.

Appellant's second ground of error alleges the evidence is insufficient to support his conviction for capital murder.

Specifically, appellant contends there is no evidence proving the death of the victim was caused "in the course of committing the offense of aggravated rape" as was alleged in the indictment and found by the jury under the trial court's conforming instructions.

The evidence established appellant spoke with his thirteen year old cousin, Jamie James, by telephone on the morning of July 12, 1979. Jamie wanted to run away from home; appellant said he would help her if she would meet him at Westgate Shopping Center in Abilene at about 12:30 p.m. Appellant's father dropped him off near the shopping center on the way to taking his brothers swimming. Jamie was carrying a pillow case filled with clothing and other personal effects.

The teenagers left on foot heading west. One of appellant's statements described their route in detail. Jamie got tired of carrying the pillowcase and left it in a wooded area near an intersection. They crossed a barbed wire fence and walked to a water hole. They undressed to go "skinny dipping," but Jamie was afraid of being discovered, so they dressed again and headed for a small creek that had concrete sides and a board bridge across it. There, appellant "rolled 3 or 4 joints of marijuana [sic]" and they smoked them.

Appellant's statement continues:

*Ex parte Duffy,* 607 S.W.2d 507 (Tex.Cr.App. 1980).

8. Even were we inclined to agree appellant justifiably relied on the offense charged in the complaint in waiving examining trial, he has made no showing that his subsequent indictment for *capital murder* (as opposed to any other offense) was a "possible consequence" of that waiver within the meaning of § 51.-09(a)(2), supra; *neither are we shown why or how* his decision to waive examining trial would have been affected had he anticipated the potential for a capital murder indictment.

"I told Jamie that I always wanted to mess around with her. She asked what I meant by 'mess around' and I said that I always wanted to make love to her. She said that she never had before, but we decided to make love anyway. We got undressed, except Jamie didn't take off her socks. We laid on our clothing. I was on top. When I stuck my penis in her she acted like it hurt. She started crying and screaming. I got paranoid and I hit her with my fist several times in the mouth. She said that the only reason that I wanted to get her out there was to rape her and kill her. She said that she was going to tell her dad. I really hit her then and told her to shut up because I am really afraid of her 'old man.' We then got dressed. She started running and she ran onto the board over the creek. I jiggled the board and her foot slipped. *She fell into the concrete on the other side and busted her face. Her jaw started swelling up.* When she got out on the other side, I ran down the bank and up the other side.

I told her if she ran again that I would throw my knife at her. I got a little stick and opened the blade. I didn't have any fingernails, that's why I needed the stick. She ran anyway, going east along the creek. *I threw my knife and it stuck her in the back.* It didn't go in very far and fell out. I picked up the knife and ran after her. I put the knife in my back pocket still open with the blade pointing up. I picked up a stick and threw it at her. It caused her to stumble and I ran up and tripped her. She fell down. Everytime she tried to get up I pushed her down with my foot. *I took off my belt and looped it through the buckle twice. I put it around her neck and told her to come with me.* She told me no. She said that I was going to go kill her. *She was pulling the opposite direction and the belt kept getting tighter around her neck. She started choking* and I tried to loosen the belt but it wouldn't loosen. *She was choking and foam was coming out of her mouth. I pulled her over across the creek* on the south side to a clearing and set

down on her stomach. I started slapping her to get her to quit acting like she was having some kind of seizure. I thought she was faking. She didn't quit so *I hit her with my fist pretty solid.* I got some water from the creek and put on her face to wake her up, but she wouldn't wake up. Her eyes were rolling back in her head and her body was shaking. Her tongue was in the back of her mouth like she was swallowing it. I tried to stick my finger in her mouth but she bit me. *I noticed that my knife had been poking her in her belly* so I took it out and put it beside her on the ground. When she bit me *I took the knife and tried to get her tongue out with the knife but she bit down on it and it cut her tongue.* I went to the water hole and found an old rusty bucket. I cleaned it out and got some water. I went back and threw it in her face. But stuff kept coming up like she was trying to barf. *I got up and got a limb and hit her in the head. I pulled her by the belt and drug her into the bushes.*"

He left Jamie there and went back to the water hole. There he tried to roll a joint but was shaking too much. He threw his knife into the water hole.

Appellant then heard people coming; it was his brothers, their friends and his niece. As they were swimming, the others asked appellant why he was shaking so much. He told them he had nearly been hit by a truck.

Later that evening, Jamie's father questioned appellant about her whereabouts. He denied any knowledge. Jamie was subsequently reported as a runaway.

Jamie's remains were found seven weeks later in exactly the location described by appellant, with the belt, "formed into a slip knot [still] around the remains of the neck." An autopsy identified two causes of death: strangulation and "massive trauma to the right side of the head resulting in massive fracturing of the skull." The impact point was described as being on "a bone called the Zygomatic Arch [which is] slightly above [the cheek bone] which would have been just in front of the ear." According to the examining pathologist, all of the numerous

skull fractures were caused by a single blow to this bone.

■ Appellant now contends the aggravated rape had been completed prior to the events leading to the death of the victim, and the death therefore did not occur "in the course of committing the offense of aggravated rape."

The Court has held "in the course of committing" an offense listed in V.T.C.A. Penal Code, § 19.03(a)(2), means conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense. *Riles v. State,* 595 S.W.2d 858, 862 (Tex.Cr.App.1980). Under appellant's statement, the final act which was certain to cause Jamie's death was his placing his belt in a slip knot around her neck, then pulling on it and dragging her by it. This he did after overtaking his fleeing victim, who was already mortally wounded.[9] His expressed fear of Jamie's "old man" provides the motive for his conduct in stalking, then killing her after having sexual intercourse with her. We see no material difference between this and the armed bank robber who shoots his victim as he flees, in order to eliminate the only witness to his crime. Moreover, we believe that this is the very conduct the Legislature sought to proscribe as a capital offense in § 19.03(a)(2), supra.

Appellant also argues there is no evidence which corroborates his written admission that he had intercourse with his victim.

Jamie's mother testified she heard part of a telephone conversation between her daughter and appellant when she picked up an extension in the morning of July 12, 1979. The fact that appellant was dropped off by his father at the shopping center that day was corroborated. As a result of appellant's telling officers about Jamie's leaving her pillow case on the ground, the pillow case and its contents were recovered. A friend of appellant's brother, Chuck Case,

testified that after they had been swimming on the afternoon of July 12, appellant stopped near the creek with the bridge and concrete embankment to pick up his socks. According to appellant's statements, this was where he and Jamie had undressed and had intercourse. All the injuries described in the autopsy were consistent with injuries appellant admitted inflicting. The belt was found around the neck of Jamie's remains, and appellant demonstrated to officers how he had tied the knot on the belt; his demonstration was identical to the knot on the belt found at the scene. Chuck and Steven Case testified appellant appeared nervous and afraid when they encountered him at the swimming hole on July 12.

■ It is well settled that if there is some evidence corroborative of a confession, the confession may be used to establish the "corpus delecti." *White v. State,* 591 S.W.2d 851 (Tex.Cr.App.1979); *Thomas v. State,* 108 Tex.Cr.R. 131, 299 S.W. 408 (Tex. Cr.App.1927). In *White,* supra, the appellant admitted he participated in murders which occurred during the course of robbery. No independent evidence established a robbery had been committed. The Court held the confession was sufficiently corroborated by circumstances which coincided with details of the confession.

In *Thomas,* supra, it was stated:

"A confession is sufficient, if there be such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction of the defendant's guilt in the minds of the jury beyond a reasonable doubt. Such suppletory evidence need not be conclusive in its character. When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of the accused. Full proof of the body of the crime, the corpus delecti, independently of the con-

---

**9.** Appellant had already "caused serious bodily injury or attempted to cause death to the victim in the course of the same criminal episode" by jiggling the board bridge over the creek

which in turn caused her to fall and fracture her skull on the concrete. See V.T.C.A. Penal Code, § 21.03(a)(1).

fession is not required by any of the cases.... [citations omitted]."

299 S.W. at 410.

Viewed in a light most favorable to the verdict, the evidence is ample to support it.

The judgment of conviction is affirmed.

MILLER and CAMPBELL, JJ., not participating.