Jerry Lane JUREK, Petitioner-Appellant,

v.

W. J. ESTELLE, Jr., Director, Texas Dept. of Corrections, Respondent-Appellee.

No. 78–1374.

United States Court of Appeals, Fifth Circuit.

April 23, 1979.

Rehearing En Banc Granted June 5, 1979.

Jay Topkis, John Charles Boger, New York City, for petitioner-appellant.

John L. Hill, Atty. Gen., Anita Ashton, R. Kristin Weaver, David M. Kendall, Jr., Gilbert Pena, Asst. Attys. Gen., Austin, Tex., for respondent-appellee.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

On February 2, 1974, in Cuero, Texas, Jerry Lane Jurek was convicted of capital murder and sentenced to death. The Texas Court of Criminal Appeals affirmed the conviction and sentence. 522 S.W.2d 934 (Tex.Cr.App.1975). The Supreme Court of the United States also affirmed, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Jurek's execution was set for January 19, 1977. On January 17, 1977, Jurek's execution was stayed and he petitioned for a writ of habeas corpus in the United States District Court for the Southern District of Texas. After a hearing, that court ruled against him. We reverse. We hold that Texas must give Jurek a new trial.

I.

Jurek gave two written confessions to the police; they were admitted into evidence at his trial and were instrumental in convicting him and in causing him to be sentenced to death.[1] Jurek's trial counsel unsuccessfully moved to suppress these confessions, and in his habeas petition Jurek again argues that they should not have been used against him at his trial. We agree. We believe that the confessions were extracted from Jurek under circumstances which render them involuntary.

On August 16, 1973, a ten-year-old Cuero girl named Wendy Adams disappeared. At one o'clock in the morning of August 17, two police officers investigating her disappearance arrested Jurek at his parents' home in Cuero. One of the officers was Wendy Adams's father. Jurek was questioned for a time, then taken from his home. He was wearing neither a shirt nor shoes. He was not logged into the Cuero jail until 2:30 a.m.[2]

For at least the next ten hours, Jurek was questioned by a series of police officers and prosecutors. There were some respites, during which Jurek apparently was allowed to sleep. The officers and prosecutors testified that they warned Jurek of his rights at least twice. In the afternoon of August 17, Jurek was taken to Austin, Texas, 120 miles

---

1. See footnote 4 infra.

2. Neither the state courts nor the federal district judge made detailed findings about the events leading up to the confessions. The facts we recite are either undisputed or compellingly supported by the record.

away, for a polygraph examination. At this time, the district court found, he was confronted with evidence that he was lying; he then made a verbal statement revealing that he was involved in Wendy Adams's death. This statement was not used at Jurek's trial, but it convinced the police and prosecutors that Wendy Adams was dead and led them to her body.[3]

At 10:15 p. m. on August 17, Jurek was returned to Cuero and—twenty-one hours after his arrest—brought before a magistrate for the first time. The magistrate advised him of his rights. This magistrate testified that Jurek said "he could not afford a lawyer and the Court would have to appoint him one," Trial Transcript at 88, but no attorney was appointed. Jurek was returned to jail and interrogated further by several officers.

At about 1:15 a. m. on August 18, Jurek gave the first of the two written confessions that were eventually used against him. Only law enforcement officers were present when the statement was taken, but two other people witnessed Jurek's signature and one of them testified that Jurek had been apprised of his rights and that the statement was voluntary. The county attorney testified that before signing the statement Jurek said that he did not want a lawyer. In this statement Jurek admitted that he had killed Wendy Adams and had thrown her body into a river.

After he made this confession, Jurek was transferred to the jail at Victoria, Texas, twenty miles from Cuero. The police testified that they transferred Jurek because they were concerned for his safety. Twelve hours later, however, they brought him back to Cuero; as the prosecutors subsequently testified, they were not satisfied with his first confession, and they interrogated him again. About five hours after his return to Cuero, at 7:30 p. m. on August 18, Jurek signed a second written confession. In this statement he admitted that he had made sexual advances toward the victim. It seems likely that Jurek would not have been sentenced to death if he had not made this second statement.[4] Jurek signed this confession forty-two hours after he was first arrested. During that time he had seen neither his parents nor an attorney.

Jurek was twenty-two years old when these events occurred. There was medical testimony that he has a verbal IQ of 66 and that he is unable to recite the alphabet, to give change for a dollar, or to say how many weeks there are in a year or what month comes before November. He may suffer from brain damage.

Jurek argues that his remark to the magistrate constituted a request for an attorney; since none was appointed, he says, the two written statements he subsequently gave are inadmissible under *Miranda v. Arizona*, 387 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Alternatively, Jurek argues that even if his *Miranda* rights were not violated, his confessions cannot be used against him because they were involuntarily given. The federal district court ruled against Jurek on both points. It acknowledged, however, that the events that led up

---

**3.** *See* Deposition of Wiley Cheatham at 38, 41, 45. At oral argument, the Assistant Attorney General of Texas said: "During the polygraph examination, the law enforcement officers learned that Wendy Adams was, in fact, dead, that her body had been thrown in the river. They started searching the river outside of Cuero."

**4.** Under the Texas law in force at the time of the crime, murder was punishable by death only if an aggravating factor was present. Tex. Penal Code Art. 1257(b). Jurek was charged with the aggravating factor of having committed murder "in the course of committing and attempting to commit kidnapping of and forcible rape upon the victim." Jurek took Wendy

Adams from a swimming pool to the place where he allegedly killed her, but several other people were apparently at the pool when they left, Trial Transcript at 1601, and there is some evidence that Jurek and the victim knew each other beforehand, *see, e. g.*, Trial Transcript at 1594. In his confession Jurek said that she had left the pool voluntarily at his request. Exhibits at 1. Thus it is far from clear that the state proved an attempted kidnapping. Since the doctor who performed the autopsy testified that he found no bruises around the victim's genital area, and that her bathing suit had not been torn, the confession was apparently the only significant evidence of an attempted rape.

to the confessions "arouse the conscience of the observer." We would go one step further. We believe that, under all the circumstances, Jurek's confessions were involuntary. We therefore need not decide whether his *Miranda* rights were violated as well.

■ Previous cases deciding whether confessions are voluntary "yield no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). "Voluntariness," in the constitutional sense, is so difficult to define because almost anything the police do is likely to influence the accused to some degree; even a mildly phrased question, asked after proper warnings, places some pressure on the defendant to give an answer. It is clear that not all such answers are constitutionally involuntary. But it is also clear that at some point the pressure can become too insistent; we then say that the responses elicited are "involuntary" and cannot be used by the prosecution. In its efforts to define how much pressure is too much, however, the Supreme Court has only concatenated metaphors. To be voluntary a confession must be "the product of an essentially free and unconstrained choice." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). The decision to confess must be "freely self-determined," *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), "the product of a rational intellect and a free will," *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). The defendant's "will to resist," *Rogers v. Richmond*, 365 U.S. at 544, 81 S.Ct. 735, must not be overborne; nor can his "capacity for self-determination [be] critically impaired," *Culombe v. Connecticut*, 367 U.S. at 602, 81 S.Ct. 1860. By themselves these phrases are not altogether helpful, but they do alert us to the two basic reasons that involuntary confessions cannot be used. First, they are unreliable, so admitting them into evidence denies the defendant due process of law. *See, e. g. Michigan v. Tucker*, 417 U.S. 433,

448–49, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Second, even using an accurate involuntary confession against a defendant violates the fifth amendment's mandate that "No person . . . shall be compelled in any criminal case to be a witness against himself."

Accordingly, when we examine the constellation of psychological and physical pressures brought to bear on a defendant like Jurek, we must ask whether they were the sorts of pressures likely to cause him to confess falsely; but the Supreme Court has made it unmistakably clear that we cannot stop there. *See Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). We must go on to consider whether these sorts of pressures offend against the principles underlying the self-incrimination clause. One of these principles is that it is unhealthy for the government habitually to rely on the accused as its principal source of evidence, both because

> The simple and peaceful process of questioning breeds a readiness to resort to bullying and to physical force . . . . . If there is a right to an answer, there soon seems to be a right to the expected answer,—that is, to a confession of guilt.

*Escobedo v. Illinois*, 378 U.S. 478, 489, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964), *quoting* 8 Wigmore, Evidence (3d ed. 1940) 309, and because, more intangibly, law enforcement authorities must not, in their attitudes and actions, treat criminal defendants as their prey or as a source of evidence to be exploited. *See generally Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Rogers v. Richmond*, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Relatedly, the self-incrimination clause reflects our belief that requiring a person to participate in his own condemnation, and denying him even the right to remain defiantly silent, robs him of a dignity that even an accused criminal must be allowed to preserve.

■ With these policies in mind, then, we must review the circumstances sur-

rounding Jurek's confessions. "The . . voluntariness of a confession turns on the effect of the totality of the circumstances on the defendant's will." *United States v. Ballard*, 586 F.2d 1060, 1062 (5th Cir. 1978). We are, according to the Supreme Court, under a "duty [as] an appellate court . . 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness,'" *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976), *quoting Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *see also Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 2417, 57 L.Ed.2d 290 (1978); in other words, we may overturn the district court's conclusion on this issue even if it is not clearly erroneous. And when we examine the record, we can only conclude that Jurek's confessions were involuntary.

To begin with, a person like Jurek, whose verbal intelligence is limited, is less likely to be able to understand his right to remain silent. He may also be unable to insist effectively that that right be observed. For these reasons, the Supreme Court has repeatedly recognized that a confession made by such a person is more likely to be involuntary. *See, e. g., Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); *Culombe v. Connecticut*, 367 U.S. 568, 624–25, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Fikes v. Alabama*, 352 U.S. 191, 196, 198, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). Perhaps more significantly, psychologists testified at the federal habeas corpus hearing that Jurek had the sort of mental handicaps that made him particularly susceptible to the influence and suggestions of others. The Supreme Court has said that in deciding whether a confession is voluntary we must "[weigh] . . . the circumstances of pressure against the power of resistance of the person confessing," *Stein v. New York*, 346 U.S. 156, 185, 73 S.Ct. 1077, 1093,

97 L.Ed. 1522 (1953), and has held confessions to be involuntary partly because of the unusual suggestibility of those who gave them. *See Culombe v. Connecticut*, 367 U.S. at 625, 81 S.Ct. 1860; *Fikes v. Alabama*, 352 U.S. at 198, 77 S.Ct. 281. *See also United States v. Lehman*, 468 F.2d 93, 100 (7th Cir.), *cert. denied*, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972). Thus there is a serious danger both that Jurek did not want to confess and that his susceptibility to the police officers' influence made him confess to things he did not do.

This danger is heightened by another circumstance. The statements used against Jurek were apparently not his own words. They are written in complete sentences, mostly grammatical, with even a touch of legalese.[5] Apart from the inherent improbability that a person with Jurek's limited verbal skills could utter such coherent tracts, *see* R. Vol. 2 at 41, the prosecutors and a witness to the confessions testified that Jurek was given some help in composing the statements.[6] The Supreme Court has repeatedly said, even in cases not involving a defendant of low intelligence or unusual suggestibility, that confessions are more questionable if they are composed not by the accused but by the prosecutor or the police. *See, e. g., Spano v. New York*, 360 U.S. 315, 322, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). *See also Blackburn v. Alabama*, 361 U.S. 199, 204, 207–08, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Fikes v. Alabama*, 352 U.S. 191, 195, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

In addition, Jurek's confessions were the fruits of an extraordinary series of actions by the police and prosecutors; these actions are significant both because of their effect on Jurek and because in deciding whether a confession is voluntary we must consider "the manifest attitude of the police toward" the defendant. *Smith v. Heard*, 315 F.2d

---

5. Fairly typical is this sentence from the second confession, referring to the first statement given to the state attorney: "In the statement that I gave him I did not tell the truth about the conversation I had with Wendy at the river and about the prior discussion about trying to find some girls to pick up and I now herein wish to correct that statement." Exhibits at 2.

6. *See* Deposition of Wiley Cheatham at 58, 61; Trial Transcript at 1298, 1397.

692, 694 (5th Cir. 1963).[7] Jurek was arrested at one o'clock in the morning and taken from his home without a shirt or shoes. For at least forty-two hours he was kept away from his family and not given an attorney. He was moved from Cuero to Austin and then back to Cuero, then to Victoria and back to Cuero again. *See Clewis v. Texas*, 386 U.S. 707, 711, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) (compelled travel during interrogation is a factor suggesting involuntariness). Whatever these actions were intended to accomplish, their effect could only have been to disorient Jurek, to weaken his resistance and heighten his suggestibility. And there is unfortunately some reason to believe that the police did intend to break Jurek down. They arrested him without a warrant. They in effect cross-examined him on the basis of his polygraph results. Texas law requires that a person who is arrested "shall without unnecessary delay" be brought before a magistrate, Te ¬.Code Crim.Proc. Arts. 14.-06, 15.16, and a card carried by the police tells them that "any unnecessary delay in taking an accused before a magistrate will void a confession," and indicates that a statement may be taken only if "there is no magistrate available," Exhibits at 5. Nevertheless Jurek did not see a magistrate until twenty-one hours after he was arrested, and the police do not suggest that none was available earlier. The Supreme Court has said that this sort of delay is evidence that a confession is involuntary, *see, e. g., Clewis v. Texas*, 386 U.S. 707, 709, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Fikes v. Alabama*, 352 U.S. 191, 194 n.2, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), and the reason is clear; a magistrate might help break the defendant's isolation and lift the psychological siege of the law enforcement authorities. Jurek received no such relief until the police had overcome his resistance and obtained an incriminating verbal statement from him.

The police and prosecutors insist, however—and we do not doubt what they say—that during the forty-two hours they frequently warned Jurek of his rights, and that before he gave his first written confession he expressly refused an attorney. But it is not clear that Jurek would be able to understand the warnings unless they were couched in the simplest language.[8] In the case of a mentally handicapped defendant like Jurek, the actions of the police speak louder than their words, and their actions surely did not suggest that Jurek was entitled to remain silent and to consult with an attorney. The Supreme Court has recognized this:

> Petitioner had been in the continuous custody of the police for over eight hours and had not been fed at all during that time. He had not been given access to family, friends or counsel at any point. He is an illiterate, with only a third grade education, whose mental capacity is decidedly limited. Under such circumstances the fact that the police may have warned petitioner of his right not to speak is of little significance.

*Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967).

In fact, Jurek argues that when he was brought before the magistrate he did request an attorney. As we have noted, the magistrate testified that Jurek had said that "he could not afford a lawyer and the Court would have to appoint him one." None was appointed and Jurek was taken back to jail. After some further interrogation, Jurek apparently told the county attorney that he did not want an attorney; then he made his first confession. The federal district court ruled that on these facts, Jurek's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694

---

**7.** The attitudes and motives of the police are important for at least two reasons. First, as we have said, for the police to approach a criminal accused as a prime source of evidence is itself an offense against the principles of the self-incrimination clause. *See* p. 676 *supra.* Second, and more immediate, evidence of the approach and motives of the police helps us reconstruct the atmosphere of the interrogation, where much depends on nuances and on the attitude communicated to the defendant.

**8.** See R. Vol. 2 at 58, 41.

(1965), were not violated. When a defendant requests counsel, however, *Miranda* requires the interrogation to cease immediately; any subsequent "waiver" of counsel—such as the statement Jurek made to the county attorney before his first confession—has no legal significance. *United States v. Priest*, 409 F.2d 491, 493 (5th Cir. 1969). Thus if Jurek's remark to the magistrate constituted a request for counsel, both of Jurek's confessions were automatically inadmissible under *Miranda*, irrespective of the other circumstances. And Jurek's remark may well have constituted such a request, especially in light of his limited verbal abilities and of the events of the previous twenty-one hours. But we do not decide whether the magistrate's inexplicable failure to appoint counsel, and the subsequent continued interrogation, formally violated *Miranda*. Rather, we consider the careless treatment of Jurek's possible request for an attorney to be further evidence of the involuntariness of his confessions. It is an indication that the inherently coercive nature of Jurek's custody, *see Miranda v. Arizona*, 384 U.S. 436, 458, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was never dispelled.

Finally, even after Jurek had signed the first statement the authorities did not relent. They moved him from Cuero to Victoria but then brought him back because the district attorney had a "feeling" (Trial Transcript at 1326) "from when I first found that she was dead" (Deposition of Wiley Cheatham at 62) that sex was involved in the offense.[9] For this reason the officials again questioned Jurek and, some forty hours after his arrest, obtained the second statement; as we have said, without this statement Jurek may well have escaped the death sentence. When they questioned Jurek in an effort to elicit his second confession, the authorities were not trying to find Wendy Adams, for they had already found her body;[10] they were not even trying to find out who killed her, for Jurek had already confessed to that. It is difficult to resist the conclusion that they were trying to gain the evidence that would send Jurek to his death. The Supreme Court has addressed itself specifically to this sort of purposive interrogation:

> The police were not therefore merely trying to solve a crime, or even to absolve a suspect. . . . They were rather concerned primarily with securing a statement from defendant on which they could convict him. The undeviating intent of the officers to extract a confession from petitioner is therefore patent. When such an intent is shown, this Court has held that the confession obtained must be examined with the most careful scrutiny . . . . .

*Spano v. New York*, 360 U.S. 315, 323–24, 79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265 (1959). *See Clewis v. Texas*, 386 U.S. 707, 711–12, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Chambers v. Florida*, 309 U.S. 227, 232–35, 240, 60 S.Ct. 472, 84 L.Ed. 716 (1940). At the time of the first written statement, the officers knew that Wendy Adams was dead and believed that Jurek had killed her;[11] thus that statement, too, was the product of the officers' "undeviating" efforts "to extract a confession." When we follow the Supreme Court's instruction to scrutinize these confessions closely, we find that they were the result of the prolonged, continuous isolation and repeated interrogation of a suggestible, mentally handicapped defendant. The Cuero police and prosecutors were faced with a brutal crime, and their treatment of Jurek may, to some, seem humanly understandable. But they violated the Constitution, in a serious way that had grave consequences. When all the circumstances surrounding the confessions are viewed together the issue is not very close. We hold that Jurek's confessions were involuntary. The Texas trial court should not have allowed them to be used against him, and he is entitled to a new trial.

---

9. Apparently the district attorney had no evidence to support his "feeling." *See* Deposition of Wiley Cheatham at 62.

10. Deposition of Wiley Cheatham at 69.

11. *See* footnote 3 *supra*.

## II.

In addition to claiming that his confessions were involuntary, Jurek asserts that *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), requires us to overturn his death sentence. *Witherspoon* held that a death sentence "cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777. A state may exclude only those prospective jurors who make it "unmistakably clear . . . that they would *automatically* vote against" the death penalty "without regard to any evidence that might be developed at the trial," or whose "attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." *Id.* at 522 n. 21, 88 S.Ct. at 1777 (emphasis in original). Texas practically concedes that at least one potential juror was excluded for cause from the jury that convicted and sentenced Jurek solely because of her conscientious scruples against capital punishment. Texas claims, however, that Jurek cannot raise this apparent *Witherspoon* violation in these federal habeas corpus proceedings because he did not raise it at the trial.

In her voir dire examination by the trial judge, Mrs. Robert Schroeder, a prospective juror, was asked if she had "any conscientious scruples about assessing the death penalty in a proper case" or "any scruples against" capital punishment. She answered "Yeah. I don't believe in it." The judge also asked her, "While you are deliberating on the case and the guilt or innocence, would your deliberations be affected in any way [by the fact that you would later have to decide whether to sentence the defendant to death]?" She said "yes". Then she was asked:

Q [D]o you feel that you could serve as a fair and impartial juror?

A Yes.

Q You do. All right. And now then, could you, in the first place, if the facts justified it, could you find a defendant in a given case guilty of a capital offense?

A Yeah.

Q All right. And you are certain about that?

A Yes, sir.

Q . . . . [C]ould you answer those questions I read this morning . . . [questions which, if answered affirmatively by the jury, require that the defendant be sentenced to death], could you answer them according to the facts and the facts alone, in accordance with your thoughts?

A Yes.

At the end of the examination, this exchange took place:

THE COURT: Gentlemen, are there any questions as to her?

[STATE'S ATTORNEY]: We would challenge for cause, Your Honor.

THE COURT: All right. You are excused, and thank you, young lady.

Next juror, please.

Trial Transcript at 604–06. Jurek's trial counsel said nothing. He neither objected to Mrs. Schroeder's exclusion nor explicitly agreed to it.

 Excluding Mrs. Schroeder for cause was a clear *Witherspoon* violation. She had conscientious scruples against capital punishment, but she quite clearly affirmed that she could impartially decide guilt or innocence and that she could vote in favor of imposing the death penalty if she thought the facts required her to.[12] Ordi-

---

12. Compare the testimony of the prospective juror in *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972), *quoted in* footnote 15 *infra*, who said that "no facts or circumstances whatever" would cause him to impose a death sentence. The Texas Court of Criminal Appeals apparent-

ly considered his exclusion an arguable *Witherspoon* violation. Also, the Supreme Court held that the exclusion of several prospective jurors in *Harris v. State*, 457 S.W.2d 903 (Tex.Cr.App. 1970), violated *Witherspoon, Harris v. Texas*, 403 U.S. 947, 91 S.Ct. 2291, 29 L.Ed.2d 859

narily, then, *Witherspoon* would constrain us to reverse the district court. But Texas argues that by acquiescing in Mrs. Schroeder's exclusion from the jury Jurek's trial counsel forfeited whatever *Witherspoon* claim Jurek had. In making this argument, Texas relies on a series of Supreme Court decisions [13] culminating in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

In *Sykes* a Florida prisoner petitioned for federal habeas corpus, claiming that statements obtained after inadequate *Miranda* warnings had been admitted at his trial. He had not, however, objected at trial when the statements were admitted, and under Florida law such a failure to object contemporaneously forfeits the objection. The Supreme Court held that this procedural bar must also prevent the defendant from raising his claim in federal habeas proceedings unless he could show both "cause" for his failure to object and "prejudice" resulting from that failure. Texas argues in effect that under *Sykes*, Jurek's *Witherspoon*

claim is barred because it was not raised at trial. The federal district judge, for slightly different reasons,[14] also thought that the *Witherspoon* claim had not been preserved. We do not agree. We think that Jurek's *Witherspoon* claim is not precluded by *Wainwright v. Sykes* and can be raised in this federal habeas proceeding.

In the first place, *Sykes* may be irrelevant to Jurek's claim. *Sykes* involved a defendant who violated a specific rule of Florida procedure that required a contemporaneous objection to admitting allegedly illegal confessions into evidence; under Florida law, the penalty for violating that rule is that the claim is forfeited. In general, *Sykes* deals with the extent to which such a state forfeiture bars a defendant from asserting the claim in federal habeas corpus proceedings. *See* 97 S.Ct. at 2502–03. Jurek's trial counsel may not have violated any Texas procedural rules at all. His failure to object to Mrs. Schroeder's dismissal may not have forfeited any claims even under Texas law.[15]

---

(1971) (mem.), even though many of them, at least, were far less certain than Mrs. Schroeder about whether they could vote for the death penalty. *See* 457 S.W.2d at 908.

**13.** *E. g., Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973).

**14.** *See* footnote 18 *infra*.

**15.** In Texas at the time Jurek was tried, a defendant's failure to object to a trial judge's decision to excuse a potential juror for cause apparently did not preclude the defendant from later claiming that the decision violated *Witherspoon*. *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972), involved this testimony by a potential juror:

"* * * Do you have any conscientious scruples against the assessment of death as a punishment for the crime of murder, in a proper case, sir?
"A Yes, sir, I do.
"Q I take it, by your answer, then, that there are no facts or circumstances whatever, that would justify you, personally, in rendering a death verdict in a murder case?
"A I don't believe I could.
"Q All right. You're just absolutely opposed to that penalty, on conscientious grounds?
"A Yes, sir.

"Q Thank you, sir.
(District attorney:) We'll challenge for cause.
(Defense attorney:) No objection, Your Honor.
"THE COURT: All right. You're excused, Mr. Juror."
484 S.W.2d at 382–83. On appeal, the defendant raised *Witherspoon*; the state argued that any *Witherspoon* violation had been waived. The Texas Court of Criminal Appeals explicitly ruled that the *Witherspoon* violation had not been waived. "Waiver of objection apparently will not, in itself, vitiate an improper challenge." *Id.* at 383 n.2.

Since Jurek's trial, Texas law on this point has become less clear. In *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976), *cert. denied* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977), the Texas Court of Criminal Appeals appeared both to endorse the *Tezeno* rule, *id.* at 679, and to hold that a failure to object to a challenge for cause forfeits the objection, *id.* at 683. The reason may be that in *Boulware* the defendant's counsel implicitly or explicitly joined in the prosecution's challenge for cause. *But see Hughes v. State*, 562 S.W.2d 857, 861 (Tex.Cr.App.1978); *Hovila v. State*, 562 S.W.2d 243, 247 (Tex.Cr.App.1978); *Shippy v. State*, 556 S.W.2d 246, 251 (Tex.Cr.App.) *cert. denied*, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); *White v. State*, 543 S.W.2d 104, 109 (Tex.Cr.App.1976) *cert. denied*, 430 U.S. 999, 97 S.Ct. 1689, 52 L.Ed.2d 384 (1977). But *Tezeno* seems to have been the law when Jurek

Even if Jurek violated a Texas forfeiture rule, however, so that *Wainwright v. Sykes* does apply, we believe that Jurek has shown "cause" and "prejudice"; thus his *Witherspoon* claim is not barred. The starting point of an inquiry into "cause" and "prejudice"—terms left undefined by the *Sykes* Court—is the actual reason for the defendant's failure to assert his federal rights at trial. In this case that reason is obvious. Jurek's appointed trial counsel either was ignorant of the *Witherspoon* decision (then five years old) or completely misunderstood it. Not only did he fail to object to Mrs. Schroeder's exclusion from the jury; when other potential jurors expressed misgivings about capital punishment he did not press for clarification or attempt to see if *Witherspoon* protected them. He did not mention *Witherspoon* during the voir dire and seems not to have phrased a single question in a way designed to take advantage of it. By the time of the federal habeas proceeding—

brought by a different attorney—Jurek's trial counsel knew that his failure to protect jurors with scruples against capital punishment would be attacked.[16] Nevertheless, although he protested that he knew and understood *Witherspoon*, he had difficulty coherently stating its holding. *See* Deposition at 60. Indeed his testimony at the habeas hearing suggests that he thought *Witherspoon* required all jurors strongly opposed to capital punishment to be excluded,[17] almost the contradictory of the actual holding of the case. Notably, the federal district court, although it ruled against Jurek on the *Witherspoon* issue,[18] did not expressly find that his trial counsel understood *Witherspoon*. We think it clear that counsel did not. Jurek now asks that we hold that he was denied the effective assistance of counsel at trial. We decline to do so, but we do hold that Jurek has established "cause" for his failure to raise the *Witherspoon* claim at trial.

was tried, so his trial counsel cannot be said to have forfeited Jurek's *Witherspoon* rights. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457–58, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Ex parte Turner*, 542 S.W.2d 187, 189 (Tex.Cr.App.1976).

We should note that in *Tezeno* the Texas court did not deny that counsel's failure to object has some significance. Since the prospective juror's testimony was equivocal, it said, defense counsel's failure to object was evidence that the trial court interpreted that testimony correctly when it ruled that the juror could be challenged for cause:

[The defendant's failure to object] is . . . a factor to be considered in cases such as the one at bar, where the exact meaning of a venireman's answer cannot be ascertained with total accuracy from the words of his answer alone. The trial judge being present and having an opportunity to observe, the ruling of the trial court should not be disturbed in the absence of a showing of clear abuse of discretion.

484 S.W.2d at 383 n. 2. This evidentiary principle is of course not unimportant to a federal habeas court, which must defer to a state court's findings of fact in many circumstances. *See* 28 U.S.C. § 2254(d). Similarly, in *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the Supreme Court apparently viewed defense counsel's failure to object to his client's wearing prison clothes while on trial as evidence that the client had not been compelled to do so, *see id.* at 512–13; the Court did not seem to treat the problem as one involving a state forfeiture rule. But an eviden-

tiary inference or evidentiary principle is entirely different from a forfeiture rule and has nothing to do with *Wainwright v. Sykes*. If Jurek's counsel did not forfeit the *Witherspoon* claim under Texas law, Texas cannot contend that *Wainwright v. Sykes* requires that claim to be barred from a federal habeas court.

**16.** *See* Deposition at 34–35.

**17.** *See* R. Vol. 2 at 134–35. *See also* Trial Transcript at 683–84.

**18.** The district judge held that Jurek's trial counsel's acquiescence in Mrs. Schroeder's exclusion was in effect a peremptory challenge. Apparently his thought was that Jurek's trial counsel did not want Mrs. Schroeder on the jury and could save a peremptory challenge if he simply acquiesced in the improper challenge for cause. There are at least two difficulties with this conclusion. First, the Texas law that evidently prevailed when Jurek was tried, *see* footnote 15 *supra*, permitted a defendant who silently acquiesced in an erroneous challenge for cause to raise the error later, whatever the reason for his acquiescence. Second, we do not know what trial counsel's tactics would have been if he had known that under *Witherspoon* Mrs. Schroeder could not properly be excused for cause. We do not, of course, intend to suggest that a defense attorney may not use peremptory challenges against jurors whom *Witherspoon* protects from a challenge for cause.

We reach this conclusion for a variety of reasons. First, our earlier decisions interpreting *Wainwright v. Sykes* hold that attorney misfeasance can constitute "cause," see *Sincox v. United States,* 571 F.2d 876, 879–80 (5th Cir. 1978); *Jiminez v. Estelle,* 557 F.2d 506 (5th Cir. 1977);[19] Jurek's attorney's apparent ignorance of a significant constitutional right is a serious form of misfeasance. Indeed, *Sykes* itself emphasizes the role of the defense attorney as trial tactician and strategist, see 97 S.Ct. at 2508 at n. 14, and says that one purpose of the "cause" requirement is to ensure that considered tactical choices made by counsel are final and binding. *Id.* at 2508. Jurek's trial attorney's abdication, through ignorance, of his client's constitutional right is the antithesis of a considered tactical choice. Allowing that abdication to keep us from considering Jurek's constitutional claim would expand the "cause" requirement beyond what *Sykes* apparently intended.

■ Second, Jurek has shown "cause" because he has shown that in this particular case, Texas procedures were insufficiently hospitable to his federal claim. *Wainwright v. Sykes* and its antecedents make it clear that in deciding whether the violation of a state procedural rule forfeits a federal right, we must consider two factors—whether the state has a legitimate interest in enforcing the rule that was breached,[20] and whether the state has created a forum that is sufficiently receptive to federal claims.[21] Texas's interest in requiring an immediate objection to improper challenges is undeniably substantial.[22] And *in general,* plainly, enforcing such a rule will not unduly burden federal rights. But our cases make it clear that we cannot simply consider the rule in general, or in the abstract; we must see how it operates in the particular case before us.[23] Moreover, we must view the rule in the context of other state laws, rules, and practices. *See, e. g., Wainwright v. Sykes,* 97 S.Ct. at 2507–08; *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 1710–11, 48 L.Ed.2d 149 (1976).

In criminal cases, defense counsel—especially appointed counsel—is a crucial part of this context. This principle seems well established. We have indicated, for example, that denying a continuance to a defendant

19. Of course, the misfeasance need not amount to a denial of the defendant's constitutional right to counsel; if it did it would be an independently sufficient reason to grant relief and would make it immaterial whether other constitutional claims had been forfeited. *See also Sincox v. United States,* 571 F.2d 876, 879 n.3 (5th Cir. 1978).

20. *See, e. g., Wainwright v. Sykes,* 97 S.Ct. at 2507–08; *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 1710–11, 48 L.Ed.2d 149 (1976).

21. See, for example, in the analogous context of Supreme Court review of state court decisions, *Lawrence v. State Tax Comm'n,* 286 U.S. 276, 282, 52 S.Ct. 556, 76 L.Ed. 1102 (1932); *Davis v. Wechsler,* 263 U.S. 22, 44 S.Ct. 13, 68 L.Ed. 143 (1923).

22. The rule requiring such an objection prevents an attorney from deliberately, tactically withholding an objection and then raising it if he loses the verdict. An immediate objection also enables the judge to correct his error and allows the prosecutor to decide whether he wants to use a peremptory challenge to exclude the juror. On the other hand, a failure to object immediately to an improper challenge is less likely to injure the state than a failure, like Sykes's, to object to the admission of allegedly illegal evidence. In most cases, an alert trial judge can be expected not to make an incorrect ruling on a challenge for cause even when the opposing attorney does not object to the challenge. Almost always, the trial judge will have all the information he needs to rule on the challenge; he need not rely on counsel to bring facts to his attention. Relatedly, there is less danger that the evidence about a prospective juror's dismissal will be stale by the time the issue is raised in federal habeas proceedings. *See Wainwright v. Sykes,* 97 S.Ct. at 2508–09, 2507.

23. Thus we have excused a defendant's breach of a presumably acceptable rule requiring constitutional claims to be raised at trial; we said that in the particular case the claim would obviously have been rejected by the state court, so raising it would have been a futile gesture. *Rummel v. Estelle,* 587 F.2d 651, 653–54 (5th Cir. 1978) (en banc). *See also St. John v. Estelle,* 544 F.2d 894, 895 (5th Cir.), *adopted en banc,* 563 F.2d 168 (5th Cir. 1977) (breach of contemporaneous objection rule might be excused if, in the particular case, defendant had moved for limiting instruction); *Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

with an inexperienced attorney may be unconstitutional even though, under the same circumstances, it would be permissible to refuse a continuance to a defendant with experienced, knowledgeable counsel. *See, e. g., United States v. Uptain*, 531 F.2d 1281, 1286 (5th Cir. 1976) (citing cases). *See also Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964). In other words, in deciding whether a state procedural rule or decision has violated a defendant's rights, we must take account of the shortcomings of the defendant's counsel; we must assess the combined effect of the state procedure and the defense attorney's deficiencies. If we must consider this combined effect when we decide whether a particular defendant's constitutional rights have been violated, we should consider the same combined effect of state procedural rules and defense counsel deficiencies when we decide whether a defendant has received an adequate state forum for his federal claims.

On this analysis it is plain that Jurek did not receive an adequate state forum for his *Witherspoon* claim. By specifying that objections to improper challenges must be made immediately, Texas established a procedural requirement which obviously cannot be met by an attorney unaware of *Witherspoon*. Then Texas licensed just such an attorney and appointed him to represent Jurek. In this particular case, then, Texas made it effectively impossible for Jurek to assert his *Witherspoon* claim. We can discern no legitimate state interest strong enough to justify Texas's doing so.[24] Since Jurek has shown that the Texas trial court was insufficiently hospitable to his federal claim, we must open the federal habeas forum to him.

Third, we think the two explicit purposes of the doctrine of *Wainwright v. Sykes* are served in this case. The *Sykes* Court stressed that the defendant must go forward with an explanation of his procedural default, 97 S.Ct. at 2508; here Jurek, as we have noted, has provided a compelling explanation. The *Sykes* Court also made a point of its intention to focus not on the defendant's personal role in making a procedural choice but, as we have said, on counsel's decisions, *see id.* at 2507; here Jurek's argument relies not on Jurek's own failure to participate in his counsel's actions but on his counsel's failure to make an informed choice.[25]

■ For these reasons we believe that attorney misfeasance which amounts to an abdication of the duty to make informed tactical choices at trial constitutes "cause" within the meaning of *Wainwright v. Sykes*.

■ "Prejudice" is a less complex matter. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (per curiam), and *Marion v. Beto*, 434 F.2d 29 (5th Cir. 1970), *cert. denied*, 401 U.S. 906, 91 S.Ct. 1372, 28 L.Ed.2d 646 (1971), compel us to hold that excluding even one juror in violation of *Witherspoon* is prejudicial. *Davis* and *Marion* make it clear that a *Witherspoon* violation is not the sort of apparently harmless error that the Supreme Court found not to be prejudicial in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), *compare id.* 97 S.Ct. at 2509 *with id.* at 2512 (White, J., concurring) *and id.* at 2522 (Brennan, J., dissenting). Nor is a *Witherspoon* violation, which un-

---

**24.** Texas does have an interest in operating a system of licensing and appointing large numbers of attorneys without making difficult judgments about the abilities of each of them. Texas obviously cannot be expected to cull out every attorney who might make an occasional mistake, for example. Thus an attorney's tactical error would not ordinarily constitute "cause" excusing a procedural default. But we have no reason to believe that it will be excessively costly for Texas to avoid appointing, as lead counsel in capital cases, an attorney igno-

rant of one of the principal constitutional rights of the defendant in such a case.

**25.** We must also note that Jurek has been sentenced to death; his interest in vindicating his federal right can scarcely be overstated. Under these circumstances a court must search as assiduously as it can to find an excuse for a procedural default, and must be prepared to consider a federal claim whenever doing so will not seriously undermine the integrity of the state's procedures.

dermines the validity of the jury's verdict, the sort of error held not prejudicial in *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976) and *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1976). For all these reasons, we believe that Jurek's *Witherspoon* claim should be upheld. We need not consider any of the other points raised by Jurek.[26] Because of both the involuntariness of the confessions and the *Witherspoon* violation, the district court should have ordered that Jurek not be executed and that he be granted a new trial. The judgment of the district court is reversed and the case remanded for proceedings consistent with this opinion.

REVERSED and REMANDED.

COLEMAN, Circuit Judge, dissenting.

At the time of the murder undoubtedly committed in this case, Jerry Lane Jurek was 22 years of age. After spending a late afternoon drinking beer, he made repeated efforts to engage 10 year old Wendy Adams in conversation at the Cuero City Park. They were next seen as Jurek sped through town in his pickup, the child in the back *screaming* for help. Why nobody gave chase and nipped this crime in the bud is beyond explanation. Wendy's body was recovered two days later from the Guadalupe river, *see Jurek v. State,* 522 S.W.2d 934, 937 (Tex.Cr.App., 1975).

While one must be extra careful of constitutional rights in a case involving such a depraved, atrocious, unspeakable crime, in which a ten year old child has mercilessly been robbed of her life, I must agree with the Texas Court of Criminal Appeals and the United States District Court that Jurek failed to make out a case justifying federal intervention.

The Texas Court of Criminal Appeals held that the evidence sustained the findings of the trial judge and jury that Jurek's confessions were voluntarily made, *Id.* at 942. Its opinion will be appended to this dissent.

As in all habeas corpus cases, the burden was on the petitioner to establish a denial of constitutional rights, *Lokos v. Capps,* 5 Cir., 1976, 528 F.2d 576, 578. At the evidentiary hearing in our District Court the petitioner was represented by able counsel, one of whom was from a prestigious out-of-state law firm. Nevertheless, Jurek did not take the witness stand. He gave no evidence as to any coercion or involuntariness. If he has a mental impairment of such a degree that he could not, or did not, understand his rights or the nature of his confessions, the District Court was not allowed to observe it from the witness stand.

The District Court specifically found that there was no evidence that Jurek's incarceration in the Victoria jail resulted in lack of communication with his family; it further found that there was no evidence that Ju-

---

**26.** In particular, Jurek claims that Texas's capital punishment statute is unconstitutional as applied because it is administered in an arbitrary and capricious fashion, or in a way that discriminates against the poor and against males. The Supreme Court upheld Texas's capital punishment statute on its face at an earlier stage in this litigation, *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), but that ruling, of course, does not preclude his challenging the constitutionality of the statute as applied. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). As we have noted, *see Spinkellink v. Wainwright,* 578 F.2d 582, 614–16 (1978), this sort of challenge must show intentional arbitrariness or discrimination under the standards of *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), but such a showing, as the

*Arlington Heights* Court made clear, *see* 429 U.S. at 270, 97 S.Ct. 555, can rely on a pattern or practice of discrimination or arbitrariness and need not identify an intentionally discriminatory act or a malevolent actor in the defendant's particular case. *See United States v. Texas Educ. Agency,* 579 F.2d 910, 913–14 & nn. 5–7 (5th Cir. 1978). In addition, as our citation of *Castenada v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), indicated, *Spinkellink v. Wainwright,* 578 F.2d at 615, if a disproportionate or arbitrary impact results from constitutional but relatively unstructured sentencing procedures that permit the exercise of a good deal of discretion, we will presume discriminatory intent and place the burden on the state to explain how it has conformed its decisions about death sentences to some acceptable, neutral criterion. *See* The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 172 (1977).

rek's confessions resulted from or were tainted by delay in taking Jurek before a magistrate. These findings are not clearly erroneous.

No constitutional significance can be attributed to the fact that Jurek was arrested without a warrant, after he had been seen speeding through town in a pickup carrying a screaming ten year old girl, crying out for help, since which she had not been seen. These circumstances thundered probable cause to believe that a felony had been committed and that Jurek committed it. It must be noted, too, that at the time of the arrest the officers thought the child had only been kidnapped and was still alive. They were trying to learn where she could be found. This effort was what prompted the trip to Austin and the polygraph test. What they unexpectedly found out was that the child had been thrown in the river and thus murdered.

The majority opinion recognizes the testimony that prior to his confession Jurek was frequently advised of his rights and refused an attorney. This is said to make no difference because "it is not clear that Jurek would be able to understand the warnings unless they were couched in the simplest language". This turns the applicable burden of proof squarely on its head; it was up to Jurek to show that he was not able to understand, and had not understood, the warnings. The record shows, without dispute, that a probation officer who witnessed the first confession, testified that Jurek was fully aware of his rights; that he, the probation officer, explained those rights to him in *lay language*; and Jurek assured him that he was giving the confession of his own free will.

We have never seen Jurek; we have not seen or heard any of the witnesses. The majority disagrees with the findings of all the judges and jurors who have done so and it follows its own notions of what the evidence should have established. In my opinion, such "independent findings" are unjustified.

As I would have done, the District Court attributed no significance to the fact that Jurek was barefoot (and without a shirt) until he got to the jail. I see too many barefoot, unshirted adults strolling around today to think that this is a factor of any constitutional significance.

I make no extended comment on the discussion of the majority about the dismissal, without objection, of the prospective juror.

Since Jurek is to be awarded a new trial on the ground that his confessions were involuntary *as a matter of law* (it cannot be done on the factual findings heretofore made in the appropriate courts) and a new jury is to be selected if there is another trial, the discussion of the *Witherspoon* issue is unnecessary in the disposition of the appeal. Therefore, I regard that discussion as *dicta*. For the record, however, I will say that I do not agree that Jurek is entitled to relief on this point. I particularly disagree with conducting an *ex parte* bar examination of counsel's understanding of the law. If we are to start that practice in the absence of a finding of ineffective assistance of counsel, we are opening up new and unjustified avenues of federal habeas corpus litigation.

I am not deaf to the helpless cries of the child being forcibly drowned in the Guadalupe. I am not insensitive to the requirement that confessions must be knowingly and understandably given. The record is devoid of anything that would reasonably suggest that Jurek is innocent of the murder. In my opinion, the record shows that he confessed because he knew he was guilty. I see no warrant for rejecting the uncontradicted testimony of those who personally knew the circumstances under which the confessions were made.

Therefore, with all deference to the views of my Brethren to the contrary, I must respectfully, but emphatically, dissent.

## APPENDIX

### (Opinion of the Texas Court of Criminal Appeals)

Lastly, appellant claims his confessions were involuntary. He argues the record fails to show he "voluntarily, knowingly and intelligently" waived his constitutional rights. Appellant cites his limited mental capacity and the length and conduct of the

interrogation which led to the confessions as factors which indicate the confessions were involuntary.

Appellant was arrested at 1:15 a. m. on August 17, approximately six hours after the child's disappearance. At police headquarters, the two arresting officers read appellant his *Miranda* warnings, and questioned him for approximately 45 minutes. He denied any knowledge concerning the child's whereabouts. At 2:30 a. m., he was placed in a jail cell, which contained a bed, and was left alone until the next morning, when the county attorney, who also read appellant his *Miranda* warnings, questioned him for approximately 15 minutes. He continued to deny any knowledge about the child's whereabouts. Two or three other officers spoke with him briefly during the morning.

Later in the day, two officers took appellant to Austin for a polygraph test. During the examination, he admitted murdering the girl. Her body was later recovered on the basis of information supplied by appellant at this time. The officers arrived back at Cuero with appellant at approximately 9:30 a. m. He was immediately taken before Magistrate Albert Ley, who read appellant his rights from a magistrate's certificate. Approximately four hours later, after being questioned by the district attorney and the county attorney, appellant gave his first confession. The confession stated that he killed the child because she made derogatory comments about his family. He was taken to the County Jail at Victoria at about 1:15 a. m. He was returned to Cuero at 2:00 p. m. and gave his second confession at 7:30 that evening after again speaking with the district attorney and the county attorney and several others. In the confession he stated that he had not told the complete truth in his earlier statement and that he killed the girl because she refused his sexual advances.

The record reflects that appellant was repeatedly warned of his constitutional rights under *Miranda*. There is no evidence in the record that appellant was deprived of food or sleep, or that he was not in complete control of his faculties when he gave the confessions. He was left alone in his cells between interrogations and was offered food and beverages at various times during this two day period. There is evidence that he was alert enough to make minor corrections in the confessions before signing them.

The court conducted a separate hearing on the motion to suppress the two written confessions. Appellant did not testify either at the hearing on the motion to suppress or at the trial on the merits. The court entered an order finding that the confessions were voluntarily given. Furthermore, the court submitted the question of the voluntariness of the confessions to the jury in its charge.

Absent undisputed evidence which would render the confession inadmissible as a matter of law, the Court will not reverse the findings of the trial judge and jury as to the voluntariness of the confession. *Lisenba v. California*, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; *Jacks v. State*, 167 Tex.Cr.R. 1, 317 S.W.2d 731; *Scanlin v. State*, 165 Tex.Cr.R. 183, 305 S.W.2d 357; *McHenry v. State*, 163 Tex.Cr.R. 436, 293 S.W.2d 773.

The record amply supports the finding of the court and the jury adversely to appellant. Compare *Kendrick v. State*, Tex.Cr. App., 481 S.W.2d 877; *Grayson v. State*, Tex.Cr.App., 438 S.W.2d 553.