

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00015-CR
_____

WESLEY PAUL MALES, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR14867

_____

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

A Hood County jury convicted Wesley Paul Males of murdering his mother, Teresa Thomas, and assessed a sentence of ninety-nine years' imprisonment. On appeal, Males argues (1) that the evidence is legally insufficient to support the jury's verdict of guilt and (2) that the trial court erred by failing to submit the lesser-included offense of aggravated assault for the jury's consideration.[1]

We find that legally sufficient evidence, including Males's recorded confession to the police, supported the jury's finding of guilt. We also conclude that Males was not entitled to a lesser-included-offense instruction because, given his confession, a jury could not rationally find that Males was only guilty of aggravated assault. As a result, we affirm the trial court's judgment.

## I.    Legally Sufficient Evidence Supports the Jury's Verdict of Guilt

Males argues that the evidence is legally insufficient to support the jury's conclusion that he murdered his mother. Specifically, he contends that "[t]he primary evidentiary shortfalls . . . pertain to the elements of identity and causation of death." We disagree.

### A.    Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Second Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

(Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

By a two-count indictment, the State alleged that Males (1) "intentionally or knowingly cause[d] the death of an individual, Teresa Thomas, by striking her on or about her head or body" or (2) "intentionally, with intent to cause serious bodily injury to Teresa Thomas, commit[ed] an act clearly dangerous to human life, namely striking her on or about her head and body, which caused the death of Teresa Thomas."

3

## B.     The Evidence at Trial

The evidence at trial established that Males, who was forty years old, was deaf and was diagnosed with schizophrenia as a teenager. Males's father testified that Males lived with Teresa, who was his caretaker. Teresa's next-door neighbor, Bruce Beebe, testified that he could hear Teresa and Males "yelling at each other in the house from time to time." Susan Brown, who lived in the house across the street from Teresa, testified that Teresa said Males "was crazy but not dangerous."

Melanie Ferrington, another one of Teresa's neighbors, testified that she heard a "loud, very guttural" sound indicating "anguish" on the afternoon of Teresa's death. Susan's husband, James Elbert Brown, testified that he heard a woman's voice "wailing," "Stop, stop," at around 5:00 p.m. on the day of the incident. Brown went outside but did not see anything.

Crystal Markgraf, who lived in the area, testified that she was driving past Teresa's home when she saw a "body laying [sic] in the driveway." Markgraf said she was going to assist the person when Males, a "very tall, thin buil[t]" man with "brown hair" and "distinct" eyebrows came out of Teresa's house and "was just standing there staring at [her]."

Markgraf testified that she was scared of Males, who kept eye contact with her instead of helping the person lying in the driveway. Because her children were in the car with her, Markgraf decided to drive away while calling 9-1-1. On the recorded 9-1-1 call, which was played for the jury, Markgraf told the dispatcher that the person lying in the driveway had blood on their head and looked as if they were "knocked out." Less than three minutes into the call, Markgraf drove by Teresa's house again and told the dispatcher that there was no one in the

4

driveway anymore but that there was "no way" the person lying there had gotten up by themselves. She also added that there was a car in the driveway that was no longer there.

Joshua Lane, a lieutenant with the Hood County Sheriff's Office, was dispatched to Teresa's home. Lane testified that, while he was en route, a dispatcher informed him "that a gentleman had showed up at the police department claiming that he had killed his mother at that residence." When Lane arrived at the house at 5:07 p.m., he noticed a bloodstain "running down the driveway toward the roadway." The front door and garage were open. Lane entered the home and saw signs of a struggle in the kitchen, including a pair of glasses on the floor. He found Teresa unresponsive on the garage floor with a bloodied "traumatic injury to the back of her head." She also had blood in her mouth, a swollen tongue, swollen eyes, "very purple" bruising on her breasts, and bruises and abrasions on her arms.[2] After reviewing "blood smears going from the puddle . . . in the driveway," Lane concluded that someone had dragged Teresa's body from the driveway into the garage. Sonya Bird, the responding paramedic, testified that she arrived on the scene to find Lane performing CPR. Despite Lane's and Byrd's life-saving efforts, Teresa was never revived.

Sharon Langston, an administrative assistant for the Granbury Police Department (GPD), testified that Males came into the GPD on the day of the incident and announced, "I just killed my mother." Langston immediately reported Males's statement to GPD detectives who went to speak to Males.

---

[2]The jury saw photographs of Teresa's extensive injuries.

Richie Haught and Chris Cogdill, investigators with the GPD, met Males in the lobby while carrying an audio recorder. Haught testified that Males turned to them and said, "I had to kill my mom." The audio recording of that statement was played for the jury. On audio, Males said that he and his mother had a conflict that kept "building and building," that she was "too powerful," that he "couldn't handle it," and that her body was in the garage. Males, who had an injury to his knee, said that there was a scuffle in the kitchen. Haught, who noticed what appeared to be blood on Males's shoe, escorted Males to an interview room to conduct a recorded interview. On the recording, Males said that the conflict had been brewing for twelve years and that he was "done with it." He also said that the conflict was between him and the devil and "was a huge problem," and he clarified that only he and his mother were in the home on the day of the incident.

Jacob Shelly, a jailer for Hood County, testified that Males wrote the following letter while in jail:

Dear Dad[,] [I]t looks like that was the only way to solve the problem! . . . .

. . . .

"Also, there really hasn't been anything like plans for my life since high school
. . . . oh well. Also, several times, she said she had wished she was dead. So . . .
it's time to close that chapter and move on to something better. –Wesley P.

Dr. Tasha Z. Greenberg, the chief deputy medical examiner for the Tarrant County Medical Examiner's Officer, testified that, in addition to contusions and abrasions on her head, shoulder, torso, and arms, Teresa suffered two lacerations to the scalp by blunt force injury, which caused "hemorrhage or bleeding that [was] around and in the brain itself." She opined

6

that some of Teresa's injuries were consistent with being stomped. Greenberg testified that the injuries to Teresa's scalp and brain could have been fatal and that the manner of her death was homicide.

After hearing this evidence, the jury found that Males intentionally or knowingly caused his mother's death.

### C. Analysis

Males argues that the State failed to prove that he caused Teresa's death because testimony from Teresa's neighbors and Markgraf "only indicated [Males's] potential presence [around Teresa] and nothing more." Yet, Males confessed that he and Teresa had a conflict, that she became "too powerful," and that he "had to kill [his] mom" and did so because he "couldn't handle it."[3] Although Males had schizophrenia, he introduced nothing at trial to show that he did not intend to kill his mother.[4] *See Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010) (finding that evidence of mental illness showed why defendant intentionally and knowingly killed but did not directly rebut the culpable mental state). After he was arrested, Males wrote to his father in an attempt to explain that it was the "only way to solve the problem." Males's

---

[3]"It is well settled that if there is some evidence corroborative of a confession, the confession may be used to establish the 'corpus delecti.'" *Wooldridge v. State*, 653 S.W.2d 811, 816 (Tex. Crim. App. 1983) (quoting *White v. State*, 591 S.W.2d 851 (Tex. Crim. App. 1979), *overruled on other grounds by Bigby v. State*, 892 S.W.2d 864 (Tex. Crim. App. 1994)). "The corroborating evidence is sufficient if it permits a rational finding of guilt, beyond a reasonable doubt, when joined with the extrajudicial admission." *Turner v. State*, 877 S.W.2d 513, 515 (Tex. App.—Fort Worth 1994, no pet.) (citing *Fruechte v. State*, 316 S.W.2d 418, 419 (Tex. Crim. App. 1958)). To the extent Males's brief can be fairly read to challenge the use of his confession, we find that other testimony was sufficient to corroborate it. Specifically, Markgraf placed Males at the scene of the incident and established that he moved Teresa's body. Lane corroborated Males's statement that there was a conflict in the kitchen with his mother and established the seriousness of Teresa's injuries, which Greenburg testified led to her death.

[4]There was also no evidence that Males was not taking medicine for his mental condition.

recorded statements also established that only he and his mother were in the home during her death.

Markgraf's testimony showed that Males saw his mother lying in the driveway and waited until Markgraf drove away to move her body into the garage. Lane and Greenberg testified about the extensive injuries on Teresa's body, which were photographed and displayed for the jury. Greenberg testified that Teresa's injuries were caused by blunt force trauma and that she died by homicide.

Viewing the evidence in the light most favorable to the verdict, we find it sufficient for any rational jury to conclude, beyond a reasonable doubt, that Males intentionally or knowingly caused his mother's death. As a result, we overrule Males's first point of error.

## II. Males Was Not Entitled to a Lesser-Included-Offense Instruction

Next, Males argues that the trial court erred by failing to submit the lesser-included offense of aggravated assault in the jury charge. "We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32)).

Our review of "whether a jury must be charged on a lesser included offense" also involves "a two-step analysis." *Armstrong v. State*, 179 S.W.3d 84, 86 (Tex. App.—Fort Worth 2005, no pet.) (citing *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998)); *see Cavazos v.*

8

*State*, 382 S.W.3d 377, 382–83 (Tex. Crim. App. 2012). "The first step is to decide whether the offense is a 'lesser included offense' as defined in article 37.09 of the code of criminal procedure." *Armstrong*, 179 S.W.3d at 86 (quoting TEX. CODE CRIM. PROC. ANN. art. 37.09). "An offense is a lesser included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." *Id.* (quoting TEX. CODE CRIM. PROC. ANN. art. 37.09(1)). "[A]ggravated assault can be a lesser-included offense of murder." *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999). Here, we find this first step met since the record shows that the proof required to establish that Males committed Teresa's murder would necessarily subsume the elements of aggravated assault.

"Second, some evidence must exist in the record that would permit a jury to rationally find that if [Males] is guilty, he is guilty only of the lesser offense." *Armstrong*, 179 S.W.3d at 87 (citing *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993); *Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. [Panel Op.] 1981) (op. on reh'g)). "The evidence must be evaluated in the context of the entire record." *Id.* (citing *Moore*, 969 S.W.2d at 8). "There must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser included offense." *Id.* (citing *Moore*, 969 S.W.2d at 8). "The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence." *Id.* (citing *Moore*, 969 S.W.2d at 8). "If there is evidence from any source that negates or refutes the element establishing the greater offense, or if the evidence is so weak that it is subject to more than one reasonable inference regarding the aggravating element, the jury should be charged on the lesser included offense." *Id.* (citing *Moore*, 969 S.W.2d at 8).

9

We conclude that Males cannot meet the second step of the analysis because "[a] murder defendant is not entitled to an instruction on the lesser included offense of aggravated assault when the evidence showed him, at the least, to be guilty of a homicide." *Id.* (alteration in original) (quoting *Jackson v. State*, 992 S.W.2d 469, 475 (Tex. Crim. App. 1999) (per curiam)). Here, there was no evidence indicating that Males only intended to injure his mother. Instead, Males confessed that he had to kill his mother and that he did so. As a result, in accordance with the precedent of the Second Court of Appeals, we conclude that "there is no evidence that [Males] is guilty, if at all, only of aggravated assault." *Id.* As a result, Males "was therefore not entitled to an instruction on aggravated assault." *Id.* Consequently, we overrule Males's last point of error.

## III. Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:     September 26, 2023
Date Decided:       September 27, 2023

Do Not Publish